No. 2--06--0746     Filed:  6-13-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re MARVIN M., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 06--JD--10 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, | ) | Raymond D. Collins and |
| Petitioner-Appellee, v. Marvin M., | ) | George Bridges, |
| Respondent-Appellant). | ) | Judges, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

In an extended jurisdiction juvenile (705 ILCS 405/5--810 (West 2006)) jury trial, respondent, Marvin M., was found guilty of the crimes of aggravated battery with a firearm (720 ILCS 5/12--4.2(a)(1) (West 2006)) and aggravated discharge of a firearm (720 ILCS 5/24--1.2(a)(2) (West 2006)).  Respondent was also found guilty of attempted first degree murder, but that conviction was vacated by the trial court at sentencing.  Respondent was committed to the Department of Corrections and was given consecutive adult sentences of 20 years for aggravated battery with a firearm and 4 years for aggravated discharge of a firearm, to be served if he did not strictly comply with the terms of his juvenile adjudication.  On appeal, respondent contends that the trial court erred by denying his motion to suppress his statements to police, arguing that, under the totality of the circumstances, his statements were not made voluntarily.  We hold that respondent's statements were voluntary and affirm.

We summarize the pertinent procedural events and provide an overview of the evidence, insofar as it aids the understanding of respondent's contention on appeal.

On December 26, 2005, the victim, 13-year-old Oscar Mendez, was shot repeatedly near the Waukegan, Illinois, home of his girlfriend. On January 6, 2006, the State filed a petition seeking to adjudicate respondent delinquent based on charges of attempted murder, aggravated battery with a firearm, and aggravated discharge of a firearm, all stemming from the Mendez shooting. The petition erroneously listed respondent's age as 15; actually, about three weeks before the shooting of Mendez, respondent had turned 14.

In February 2006, the State filed a petition requesting leave to designate the proceedings as an extended jurisdiction juvenile prosecution (705 ILCS 405/5–810 (West 2006)). The trial court granted the State's request.

On February 15, 2006, respondent filed a motion to suppress an alleged pretrial identification of respondent made by Mendez and a motion to suppress statements respondent made to the police. Following a hearing, the motion to suppress the identification was granted. On March 20, 2006, the trial court heard respondent's motion to suppress his statements.

Waukegan police detective Arturo Flores testified that he was a member of the Waukegan police Neighborhood Enforcement Team (NET), a unit dealing specifically with gang crimes. Flores testified that he was involved with the investigation into the shooting of Mendez. On January 5, 2006, at about 5 p.m., Flores and NET detectives Elias Agalianos and Joseph Garcia went to respondent's home to question respondent about the shooting.

Flores testified that, at respondent's home, he was met by respondent's mother, Luisa Cilia, who spoke only Spanish. Flores testified that he told Cilia that he was looking for respondent in

reference to an investigation in which respondent's name had been mentioned. Flores told Cilia that respondent might be involved in the case under investigation. According to Flores, Cilia told him that she was worried that respondent might be involved in gangs. Flores testified that Cilia wanted the police to talk to respondent to see if they could help him overcome his gang problem. Flores testified that Cilia asked him if there were a program available for people who were involved in gangs.

Flores explained to Cilia that he wanted to talk to respondent about a current criminal investigation and that respondent's friends and respondent's gang might have been involved in the drive-by shooting under investigation. Flores did not tell Cilia that he was investigating respondent for the shooting. Flores testified that, rather, he told Cilia that he was investigating respondent "for the possible involvement in this drive-by shooting involved with his friends."

Cilia continued to ask for help for respondent. Flores maintained that he was investigating a gang crime. Eventually, Cilia told Flores that respondent was at his sister's home in Waukegan. Cilia telephoned the home and spoke to respondent. Cilia then told Flores that he could go and pick up respondent. Cilia asked Flores to "get him into some kind of program, something to help him." Flores believed that Cilia was interested in some sort of intervention program or boot camp for respondent. Cilia gave Flores the address where he could find respondent.

Flores testified that Cilia did not express an interest in going to the police station with the officers and her son. Flores testified that, instead, Cilia gave him permission to speak to respondent for as long as he wanted. Flores testified that he did not inform Cilia of her right to consult with her son before letting the police take him, explaining, "I'm not a certified juvenile officer." Flores testified that he did not know whether Garcia, who was a certified juvenile officer, explained to Cilia

the role of a juvenile officer. Once Flores brought respondent to the NET offices, he did not contact Cilia again.

Garcia testified that he was a NET detective as well as a certified juvenile officer. Garcia testified that he was involved in the Mendez shooting investigation and that, before January 5, 2006, he had been collecting information about possible suspects in the shooting. Garcia testified that he did not work as a juvenile officer in this case until he knew that a juvenile was about to be interviewed. Garcia testified that, when the team decided to interview respondent, he switched to the role of a juvenile officer because no other juvenile officers were available. When questioned about his general activities as a detective and as a juvenile officer, Garcia testified that he changes between functions on a "case-by-case basis," depending on the availability of other juvenile officers.

Garcia testified that, on January 5, 2006, he accompanied several other officers to respondent's home, where he encountered Cilia. Garcia testified that he did not speak Spanish and so he could not testify about what Cilia and Flores discussed. Garcia testified that he observed Cilia make a telephone call that he understood was to respondent and that, because Cilia told the officers where to find respondent, Garcia formed the belief that Cilia understood what was going on and that respondent would be talking with the officers. Garcia testified that Flores told him that Cilia was looking for some sort of intervention program for respondent, who, she feared, was involved in a gang.

Using the information from Cilia, Garcia and Flores drove to respondent's sister's home. Agalianos and Sergeant Kreppein accompanied them in a separate car. Garcia testified that, when they arrived, respondent met them in the driveway. Garcia testified that the officers asked respondent if he would be willing to come with them and talk about the Mendez shooting. Garcia

testified that the officers expressly told respondent that he was not under arrest but that they were investigating the shooting.

Flores testified that respondent was polite, respectful, and willing to come with the officers. Garcia testified that he informed respondent that he was a juvenile officer and that the police wanted to talk to respondent "in reference to an investigation" they were conducting. Flores testified that respondent was not handcuffed at the time he got into the unmarked police car. The officers took him to the NET offices.

Flores testified that, at about 5:30 p.m., the officers arrived at the NET offices with respondent and respondent was taken into an interview room. Garcia testified that, at that time, he had a general conversation with respondent that lasted about 20 minutes. Garcia asked respondent how long he had been in Waukegan and about school. Garcia testified that respondent told him that he was a freshman in high school but had recently been kicked out of school. Respondent did not tell Garcia why. On cross-examination, Garcia admitted that he did not ask respondent about his grades and did not ascertain how well respondent could read; instead, Garcia asked respondent only if he could speak, read, and write in English. Garcia testified that he told respondent that he was a juvenile officer whose job was to look out for respondent's rights, to answer respondent's questions, and to give respondent anything he needed, like food, drink, or a bathroom break. Garcia testified that he did not question respondent about the shooting but that he remained in the interview room when another officer came in to ask respondent questions about the Mendez shooting.

Andy Ulloa, another Waukegan police detective with the NET unit, testified that, on January 5, 2006, the officers investigating the Mendez shooting decided to question respondent because two witnesses had made statements indicating that respondent had been the shooter. Ulloa believed,

erroneously, that respondent was 15 years old at the time of the interrogation. Ulloa told respondent that the police were investigating a shooting. Garcia and Ulloa both testified that Ulloa read to respondent his Miranda warnings, using a preprinted form, and that these included an admonition that, as a juvenile, respondent had the right to consult his parents before answering any questions and had the right to have his parents present during any police questioning. Garcia testified that Ulloa explained the rights in a manner that made the language less complicated. Ulloa testified that he did not have to explain any of the words to respondent except "subsequent." Ulloa explained to respondent that, as the word was used in the warning, it meant that the juvenile proceedings might later be transferred to adult court. Both Garcia and Ulloa testified that respondent signed the portion of the form indicating that he chose to waive his rights and to talk with the police. Ulloa testified that respondent told him that he wanted to talk to him and that respondent did not ask to have his mother present during questioning.

Ulloa testified that, initially, respondent denied having any knowledge of the Mendez shooting. Ulloa testified that he confronted respondent by telling him that witnesses had told police that respondent was the shooter. Ulloa testified that respondent maintained his denial and stated that he had spent the entire day of December 26 at his aunt's house. Ulloa testified that he had watched a December 26 surveillance videotape of a fight at the Gurnee Mills mall and noticed that respondent was one of the participants. Ulloa told respondent that witnesses had seen him in the fight at Gurnee Mills. Ulloa testified that, at this point, respondent lowered his head and cried. Ulloa testified that respondent admitted that he was involved in the shooting. Respondent also admitted the he and his friends were members of the Surreno 13 street gang.

Ulloa testified that he spoke with respondent for about 30 minutes. Ulloa maintained that the tone of the conversation was calm. Respondent spoke more quietly and slowly after he admitted involvement, and he cried intermittently. Ulloa estimated that, about 15 minutes after they began speaking, respondent admitted shooting Mendez. Ulloa testified that, at about 8:40 p.m., respondent made a written statement.

Following the testimony of the police officers, respondent moved for a directed finding on the motion to suppress. The trial court denied the motion for a directed finding, making the following factual findings. First, the trial court determined that Cilia had expressed to Flores concern about respondent's involvement in gangs and her belief that he needed some sort of intervention program or boot camp. The trial court also determined that, because the police knew that witnesses had implicated respondent as the shooter in the Mendez shooting, respondent was in police custody from the time the police picked him up at his sister's house. The trial court found that Ulloa gave respondent <u>Miranda</u> warnings and that Garcia performed the duties of a juvenile officer "as he was supposed to." The trial court acknowledged that respondent had little experience with the police. The trial court concluded that there was no testimony to support the argument that the police officers tried to mislead the parents or respondent. The trial court ruled that respondent's parents knew that he had been taken by police for questioning and they did not come to the police station or ask to see respondent. The trial court also found that respondent did not ask to see his parents. The court noted that, during the interview, respondent had a juvenile officer sitting next to him and asked for nothing from the police. The court ruled that, at this point, the State had presented evidence sufficient to establish a <u>prima facie</u> case that respondent had voluntarily made statements to the police.

Respondent then presented evidence. Cilia and Elizabeth Sanchez, respondent's stepsister, both testified that, on January 5, 2006, at about 5 p.m., the police arrived at Cilia's house, looking to speak with respondent. Both Cilia and Sanchez testified that the officers told Cilia that she could not accompany respondent to the police station, because "kids don't want to talk when their parents are present." Both testified that the officers said that they needed to talk to respondent about something that had happened at school, but that nothing serious was involved. Cilia testified that, after the police left to collect respondent, she heard nothing further from the police. Cilia testified that, at about 11 p.m., she went to the police station, where she was told that no one had any information about respondent. Cilia testified that, at around midnight, Flores telephoned her and informed her that respondent had confessed and was guilty.

Respondent testified that, when he was picked up by the police, they told him that he was not under arrest. Respondent testified that, at the police station, the officers told him that his friend Luis Tellez had said that respondent shot someone. Respondent testified that, when he denied knowledge of the shooting, the officers told him that he was lying and Ulloa hit him in the chest. Respondent testified that Garcia told him that the only way he would be allowed to go home was to tell them the truth. Respondent testified that he continued to deny his involvement in the shooting until after 8 p.m., when he completed his written statement. Respondent testified that Ulloa told him what to write and that two earlier written statements were thrown away before the police accepted the third one.

The trial court held that the police officers were credible witnesses and that respondent was not a credible witness. Comparing the credibility of the witnesses, the trial court held that the State demonstrated that respondent voluntarily gave police an oral statement and a written statement. The

court also found that respondent never asked for his parents. The court acknowledged that Cilia did not hear anything from the police from the time respondent was picked up until about midnight, but it concluded that this was a relatively unimportant factor in its decision. The court also noted that there was a juvenile officer present during the questioning and that the juvenile officer had explained his role to respondent before the questioning began.

Respondent also filed a motion to quash his arrest and suppress evidence. At the hearing on that motion, Ulloa testified that he had been involved in taking statements from both Tellez and Raquel Garcia, who was Tellez's girlfriend. Each statement indicated that Tellez and respondent participated in the shooting, with respondent shooting Mendez in the mistaken belief that he was shooting Mendez's brother, Jorge Mendez. Ulloa testified that, based on the information provided by Tellez and Raquel Garcia, the NET unit decided to question respondent. Officer Garcia signed Tellez's and Raquel Garcia's written statements.

On cross-examination, respondent brought out the following information. At some point before the shooting, Jorge Mendez and Raquel Garcia had dated. They broke up when Raquel Garcia told Jorge Mendez she was pregnant. Raquel Garcia began dating Tellez, but Jorge Mendez was "bothering" Tellez and Raquel Garcia. Raquel Garcia had written a letter to Adolpho Montes-Salinas, telling him to tell Jorge Mendez "to stop bothering Raquel or he is going to get a gift that will hurt his family for the rest of their lives." Montes-Salinas relayed the message to Jorge Mendez. Jorge Mendez, in turn, challenged Tellez to meet him at the lakefront, where they would settle their differences in a gunfight. Tellez was in Mexico at the time, so he could not accept the challenge; Raquel Garcia, however, was willing to fight Jorge Mendez in place of Tellez. Montes-Salinas told

Ulloa that Tellez was a member of the Surreno 13 street gang; apparently Jorge Mendez was a member of a rival gang.

Also on cross-examination, Ulloa testified that Raquel Garcia admitted to writing the letter threatening Jorge Mendez. She also told Ulloa that, on the day of the shooting, Tellez was acting "not normal." Ulloa also acknowledged that Officer Garcia had turned up some corroborating information. Raquel Garcia's cousins described personal conflicts between Raquel Garcia and Jorge Mendez, namely that, after they broke up, Jorge was bothering Raquel Garcia and Tellez. One of the cousins also told Officer Garcia that she knew that Tellez possessed a gun three months before the shooting.

Respondent established further that at no time before the statements by Tellez and Raquel Garcia had his name arisen in connection with the shooting. Moreover, Raquel Garcia's cousins did not mention his name either.

The trial court denied respondent's motion to quash his arrest and suppress evidence. It held that the statements by Raquel Garcia and Tellez provided reasonable grounds for the police to believe that respondent had been involved in the shooting of Mendez. These grounds justified the January 5, 2006, custodial interrogation of respondent. The trial court rejected respondent's argument that the statements were unreliable because respondent's name had not previously surfaced in the investigation and thus it was likely that Raquel Garcia and Tellez were involved in the shooting, mistaking Oscar for Jorge, and then placed the blame on respondent.

In accordance with the extended jurisdiction juvenile provision (705 ILCS 405/5--810 (West 2006)), the matter was transferred to the adult felony court for a jury trial. Kathy Rangel testified that she was Oscar Mendez's girlfriend and that, at the time of the shooting, she was 13 years of age.

On December 26, 2005, Mendez spent the evening at Rangel's house, watching a movie with Rangel. At about 11 p.m., Mendez left Rangel's house to walk home. Rangel testified that she watched out her window as Mendez walked down the street. Rangel testified that a car drove by Mendez. Someone in the house called to Rangel, and she looked away. Rangel testified that, just as she looked away, she heard several gunshots. Rangel testified that she ran out of the house to Mendez, who was lying on the sidewalk. Rangel testified that Mendez's shirt was full of blood by the time she reached him.

Waukegan police officer Mike Heidler testified that he was the first police officer to arrive at the shooting scene. He was informed that a black, two-door car had left the scene, heading east. Heidler testified that he searched for shell casings in the immediate area around where Mendez had been lying, but he was unable to find any.

Mendez testified that, at about 11 p.m., he left Rangel's house and began walking home. He was wearing a white T-shirt, a gold sweatshirt, and dark blue pants. Mendez testified that, as he was walking, he heard a sound behind him but saw nothing. Then, a dark, two-door car approached him from behind at high speed. The car pulled up next to him; Mendez was about three houses away from Rangel's house. Mendez testified that there were four people in the car and that the front passenger had a "hard cut," meaning that his hair was shaved from the temples back and very short on top, and wore a bandana that covered his face from the bridge of the nose on down. Mendez testified that it was too dark to see the clothes or the faces of the other occupants. Mendez testified that the front passenger asked him where he was going and to what gang he belonged. Mendez testified that he told the passenger that he was not in a gang. Mendez testified that he saw fire, felt

something hot enter his body, and fell to the ground. Mendez admitted that, before the shooting, he had never seen or heard of respondent.

Dr. Giovanni Giannotti testified that he was a trauma physician at St. Francis Hospital in Evanston. At about 2 a.m., on December 27, 2005, he treated Mendez for multiple gunshot wounds. Giannotti did not testify to the number of times Mendez had been shot, but he did testify that he observed a total of seven wounds, some being through-and-through wounds. Mendez's most threatening injury was a gunshot wound that pierced his vena cava, the largest vein in the body, which could have caused him to "bleed out." Giannotti testified that the wounds he observed easily could have been fatal.

Officer Garcia testified that he learned about the Mendez shooting by reading police reports describing it and by interviewing Mendez at the hospital. Early in January 2006, Garcia learned that respondent was a suspect in the shooting. The gang unit decided that, on January 5, 2006, they would go to respondent's home to speak to him. Garcia's description of the encounter with respondent's relatives and picking up respondent was consistent with his testimony on the pretrial motions.

Likewise, Garcia's testimony about his preliminary conversation with respondent was consistent with his pretrial testimony. Garcia testified that he did not ask respondent anything about the shooting. Garcia testified that, instead, he observed as Ulloa questioned respondent.

Garcia then described respondent's interview with Ulloa. According to Garcia, respondent told them that he and three others drove a dark car around Jorge Mendez's neighborhood, looking for him. Respondent saw a person he thought was Jorge Mendez, and the car approached him as respondent covered his face with a dark blue handkerchief. As the car drove by, respondent shouted,

"who are you down with?" or "who do you ride for?" Respondent then fired several shots at the person, and the car drove off. After making the oral statement, respondent agreed to make a written statement. Garcia watched as respondent wrote out his statement, and Garcia signed the statement as a witness after respondent finished it.

Garcia testified that respondent told them that he discarded the gun near a restaurant. The officers took respondent to the location, but they could not find the gun. When they returned to the NET offices, respondent told them that he gave the gun to a friend.

Before commencing cross-examination, respondent moved to suppress his statements on the ground that Garcia, in his capacity as a juvenile officer, had not given respondent's mother proper notice that he would be interrogated by the police. The State pointed out the previous ruling on the issue and the trial court refused to reconsider it.

On cross-examination, Garcia testified that, in his capacity as a juvenile officer, he did not tell respondent's mother that respondent was to be questioned, but he made sure that Flores did. Garcia admitted that he did not speak Spanish, so he could not say what Flores and Cilia discussed before Cilia told them where they could find respondent. Garcia further admitted that, after they picked up respondent, he did not call Cilia or have anyone else call her to let her know where respondent was.

Continuing on cross-examination, Garcia conceded that he conducted "several," maybe as many as "four or five," interviews in furtherance of the investigation of the Mendez shooting. Garcia testified that he wrote reports about those interviews. It was only when the NET unit picked up respondent that Garcia assumed the role of juvenile officer. Before respondent was picked up for questioning, Garcia had been acting as an investigator on the case. Garcia did not tell respondent

that he had been actively investigating the case; however, Garcia informed respondent that he was a gang detective and explained to respondent what the symbol on his shirt meant.

Agalianos testified that, at some point after respondent's questioning, he went to respondent's brother's car because respondent had told the police that the bandana he wore on the night of the shooting was in his brother's car, shoved in between the car's center console and the front passenger seat. Agalianos testified that he retrieved the bandana from the spot described by respondent.

Ulloa's testimony about his questioning of respondent was consistent with his pretrial testimony recounted above. In addition, Ulloa testified that, after respondent denied knowledge of the shooting and before Ulloa elicited a statement from respondent, he told respondent that "we had several witnesses" who had "implicated" respondent in the shooting. When respondent maintained that he had no knowledge of the shooting, Ulloa "again told him that we had witnesses, that we had already been speaking to witnesses for several days and obtained lots of information that he was in fact involved," including "numerous statements" implicating respondent. Ulloa testified that, when he asked respondent if, on December 26, 2005, he had been at Gurnee Mills, respondent put his head down and started crying. Respondent then told Ulloa that he shot Oscar Mendez by mistake; respondent had been trying to shoot Jorge Mendez instead.

Ulloa testified that, as respondent was crying, Ulloa told respondent that it was important for respondent to tell him what happened, not only for the case, but to provide the Mendez family a little relief. Ulloa told respondent that Mendez's mother was really concerned and it was important that respondent cooperate.

Respondent told Ulloa that there had been problems between a girl and Jorge Mendez, not Oscar. Respondent and some friends drove past Jorge Mendez's home, looking for him. They saw

a person who looked like Jorge Mendez walking along a side street. They pulled up next to the person and asked him what gang he belonged to. The person did not answer. Respondent, who was sitting in the front passenger seat with a bandana over his face, shot the person two or three times, using a gun given to him by a friend. The group drove to a Mexican restaurant and respondent threw the gun behind the restaurant.

Ulloa testified that, after respondent provided the oral statement, he agreed to provide a written statement too. Ulloa asked respondent where was the bandana and respondent told him it was in his brother's car. Ulloa had other detectives retrieve the bandana from the brother's car. Ulloa showed respondent the bandana that had been retrieved and respondent identified it as the one he wore during the shooting.

On cross-examination, Ulloa admitted that he "pretty much" started the questioning by accusing respondent of shooting Mendez. Ulloa admitted that his statement to respondent that eyewitnesses had identified him as the shooter was untrue. Counsel pressed Ulloa whether he told respondent that there was an eyewitness; Ulloa responded that he had employed "interview tactics."

Sanchez and Cilia testified on respondent's behalf. Their testimony concerning their January 5, 2006, encounter with the police was consistent with the testimony they gave during the pretrial hearings. Respondent also testified on his own behalf. He testified consistently with his previous testimony. Respondent maintained that both Ulloa and Garcia questioned him and that Garcia did most of the questioning. Respondent also testified that both officers yelled at him and threatened to hit him if he did not give them a written statement admitting to the shooting and telling them where to find the gun.

The jury returned a guilty verdict on all three counts: attempted murder, aggravated battery with a firearm, and aggravated discharge of a firearm. Respondent filed a motion for a new trial, including an issue about the trial court's error in admitting his statements, which was denied. The trial court held a dispositional hearing and committed respondent to the juvenile Department of Corrections until he was 21 years of age. Respondent also received consecutive adult sentences of a 20-year term of imprisonment for the aggravated battery with a firearm conviction and a 4-year term of imprisonment for the aggravated discharge of a firearm conviction. The trial court vacated the finding of guilt on the attempted murder charge, finding it violative of the one-act, one-crime principle. The trial court explained that, if respondent did not satisfactorily complete his juvenile commitment, then he would have to serve the adult sentences. Respondent timely appeals.

On appeal, respondent argues that the trial court erred in denying his motion to suppress his statements. We review the trial court's ruling on a motion to suppress under a bifurcated standard. In re G.O., 191 Ill. 2d 37, 50 (2000). The trial court's findings of historical fact are accorded great deference and will be disturbed on appeal only if they are against the manifest weight of the evidence. G.O., 191 Ill. 2d at 50. The trial court's ruling on the ultimate question of whether a respondent's statements were voluntarily made is, however, reviewed de novo. G.O., 191 Ill. 2d at 50. In addition, when determining the propriety of the trial court's ruling on the motion to suppress, the reviewing court may consider the testimony from both the pretrial suppression hearing and the trial. People v. Kidd, 175 Ill. 2d 1, 25 (1996). With these standards in mind, we review respondent's particular contentions.

The overarching thrust of respondent's argument is that his statements were not voluntarily given. Respondent attacks the police conduct in four ways. First, respondent contends that, properly

considered, the totality of the circumstances proved at the suppression hearing and at trial indicates that the atmosphere in which the statements were made was unduly coercive. Second, respondent contends that the failure of the police to inform his mother that he was to be interrogated about the Mendez shooting, coupled with statements that kids do not talk when their parents are around, actively dissuaded respondent's mother from being present at the interrogation. Third, respondent contends that Garcia's role as juvenile officer during the questioning was fatally compromised by his earlier active investigation into the circumstances of the Mendez shooting, resulting in the conclusion that no adult interested in respondent's welfare was present during the questioning. Last, respondent contends that Ulloa's concession that he used interrogation tactics in order to elicit the incriminating statements from respondent, who had no previous experience with the police or the criminal justice system, renders the statements involuntary. Before considering each point, we first review the basic standards by which the voluntariness of a suspect's statement is determined.

A suspect's statement will be deemed voluntary where it is found to be the product of free will rather than the product of the inherently coercive atmosphere of the police station. People v. Minniti, 373 Ill. App. 3d 55, 68 (2007). The totality of the circumstances is considered in determining whether a statement is voluntary. Minniti, 373 Ill. App. 3d at 68. Generally, among the factors considered in the totality of the circumstances are the suspect's characteristics, such as his age, intelligence, education, experience, and physical condition at the time of the questioning; the duration of the questioning; whether he was given Miranda warnings; the infliction of any mental or physical abuse; and the legality and duration of the detention. Minniti, 373 Ill. App. 3d at 68. No one factor is dispositive. Minniti, 373 Ill. App. 3d at 68.

Because taking a statement from a juvenile is a sensitive concern, additional care must be taken to make sure that the juvenile's statement was not the product of coercion or suggestion and that it was not elicited due to the juvenile's ignorance of his rights or as the result of adolescent fantasy, fright, or despair. G.O., 191 Ill. 2d at 54. To safeguard the juvenile particularly, additional factors are considered in the totality-of-the-circumstances inquiry, including whether the juvenile, either before or during the questioning, had the opportunity to consult with an adult interested in his welfare; whether the police prevented the juvenile from consulting with a concerned adult; and whether the police frustrated the adult's attempt to confer with the juvenile. Minniti, 373 Ill. App. 3d at 68. That said, we note that there is no per se rule that requires the suppression of a juvenile's statement because he was denied the opportunity to consult with a parent or a concerned adult before or during the questioning. Minniti, 373 Ill. App. 3d 68.

A final factor to consider, for both juveniles and adults, is the presence of police trickery and deceit. Minniti, 373 Ill. App. 3d at 68-69. While police are allowed to play on a respondent's ignorance, fear, and anxieties, they may not engage in conduct that overbears the respondent's will or renders him incapable of making a rational decision. Minniti, 373 Ill. App. 3d at 69.

Our consideration of the record and of the totality of the circumstances leads us to the conclusion that respondent's statements were given voluntarily. The trial court first found that respondent was in custody from the time the police picked him up in front of his sister's house. The trial court further determined that the officers had probable cause to arrest respondent, based on information given by Tellez and Raquel Garcia. The trial court next held that respondent was given Miranda warnings. Looking to respondent's personal characteristics, the trial court held that respondent appeared to be reasonably intelligent, able to read and understand English, able to ask

questions to clarify concepts that he did not understand, and able to understand what was said and read to him. The trial court also held that respondent was 14 years of age at the time of the questioning and had no experience with law enforcement. The time of the interrogation was reasonable, beginning around 5:30 p.m. and lasting until around 8:30 p.m. The trial court held that respondent's parents were not prevented from meeting with him before or during the questioning and that the evidence indicated that Cilia was aware the police were going to question respondent. Knowing this, Cilia did not try to contact the police until about 11 p.m., nearly six hours after respondent had been taken for questioning. The trial court found that there was no evidence that respondent ever requested to consult with his parents. Further, respondent appeared to make no requests of the juvenile officer. The trial court specifically found that Officer Garcia was appropriately performing his duties as a juvenile officer during the questioning.

Further, considering the credibility of the witnesses, the trial court expressly found the police officers to be credible. It expressly found that respondent's testimony was wholly incredible. Likewise, the trial court noted that Sanchez's and Cilia's testimony regarding their interaction with the police officers was not credible versus the officers' accounts.

We have reviewed the record carefully and conclude that these findings are not erroneous. Looking to the totality of the circumstances, we note that respondent was young and had no previous experience with law enforcement. He did not ask for his mother at any time during the questioning; likewise, his mother was aware of the fact that he was to be interrogated, and she did not attempt to contact the police or respondent until much later that evening. Respondent was given access to a juvenile officer, who assessed that respondent's mental acuity was sufficient to allow him to understand what was happening and the rights he was being asked to waive. There was no credible

evidence that the police threatened, tricked, or frightened respondent into talking. Based on these considerations, we hold that, under the totality of the circumstances, respondent's statements were made voluntarily.

We note that respondent's remaining contentions focus on specific aspects of the surrounding circumstances, and we will explore them in more depth below. Regarding his general totality-of-the-circumstances argument, respondent contends that his tender age and his inexperience with law enforcement are the paramount factors for our consideration. In light of his tender years and inexperience, respondent urges that he was unable to resist the inherently coercive atmosphere of the station house and that his statements were involuntarily made. In support of this contention, respondent relies on People v. Robinson, 301 Ill. App. 3d 634 (1998), and People v. McDaniel, 326 Ill. App. 3d 771 (2001).

In Robinson, the police told the 14-year-old defendant's mother that they wanted to talk to him because he had been implicated in some garbage-can fires and that a person had been hurt. The police did not tell the defendant's mother that a baby had died in one of the fires. Further, the police did not explain to the mother that the defendant would be asked to waive his rights when speaking to the police. Robinson, 301 Ill. App. 3d at 635-36. The mother asked if she needed to go to the station, and the officer responded that she did not, because the police were just going to ask the defendant a few questions. A short time later, the mother called the station but was not allowed to speak with the officer interviewing the defendant. Robinson, 301 Ill. App. 3d at 638.

The police took the defendant to the station. There, he was given his Miranda warnings. The defendant could not pronounce the word "coercion" and could not explain what it meant. The officers defined the word for the defendant. Robinson, 301 Ill. App. 3d at 636-37. The defendant

then gave a statement that implicated him in the fire that resulted in the baby's death. Robinson, 301 Ill. App. 3d at 636.

The defendant presented evidence that he was in special education classes in school. Additionally, he had low intelligence and attention deficit hyperactivity disorder. His reading level was low--that of a third or fourth grader. Psychologists opined that the defendant could not understand the statement of rights and could not knowingly and intelligently waive his rights. Robinson, 301 Ill. App. 3d at 638-39. Additionally, the defendant had little experience with law enforcement. Robinson, 301 Ill. App. 3d at 637. The trial court held that the defendant's statement was given voluntarily. Robinson, 301 Ill. App. 3d at 639.

The appellate court held that the defendant's statement was involuntary. The appellate court determined that the police had prevented the defendant from conferring with a parent and prevented the defendant's mother from coming to the station by misleading her about the gravity of the situation, even after she had demonstrated an interest in communicating with the defendant. Robinson, 301 Ill. App. 3d at 641-42. Additionally, the police did not make a juvenile officer available to the defendant. Robinson, 301 Ill. App. 3d at 642. The court also looked to the defendant's personal characteristics, concluding that his low intelligence, young age, lack of reading ability, and lack of experience with law enforcement contributed to the involuntary statement. Robinson, 301 Ill. App. 3d at 642.

Respondent analogizes his situation to that of the defendant in Robinson, noting that respondent was the same age as the defendant in Robinson. Respondent points to the fact that the police officers testified that he wept during his statement as further evidence of his immaturity and inability to successfully deal with the pressures of police interrogation. Additionally, as in Robinson,

respondent had little previous contact with law enforcement. We find Robinson distinguishable. While respondent shares some characteristics with the Robinson defendant, we note that, unlike in Robinson, there is no evidence to show that respondent could not understand the Miranda rights, and there is no evidence to show that respondent could not knowingly and intelligently waive them. Additionally, unlike in Robinson, there is no credible evidence showing that Cilia wanted to accompany respondent to the police station or tried to contact him during the interrogation. For these reasons, Robinson is sufficiently factually distinct from this case to provide little or no support for respondent's contentions about the voluntariness of his statements.

In McDaniel, the 14-year-old defendant's motion to suppress his statement was denied. The defendant had been arrested by police around 2 a.m. The defendant arrived at the police station at about 2:30 a.m., and his mother arrived at about 3 a.m. The police testified that the defendant expressly stated that he did not want his mother present when he provided a statement. McDaniel, 326 Ill. App. 3d at 774. The police told the defendant that he would not be able to give a statement until a juvenile officer arrived. At about 8 a.m., the juvenile officer arrived, and the defendant was interviewed in the presence of the juvenile officer. McDaniel, 326 Ill. App. 3d at 775. The police testified that, shortly after 8 a.m., an officer spoke with the mother, and, after the defendant had given a statement, the mother was allowed to confer with the defendant, at the defendant's request. The statement was reduced to writing and read to the defendant in his mother's presence; the defendant denied making the statement and refused to sign it. McDaniel, 326 Ill. App. 3d at 775-76.

The defendant's mother testified that the police came to her house at about 2 a.m. and took the defendant to the police station. The mother testified that she and the defendant rode in the same car to the police station. The mother tried to contact the defendant while he was in the interview

room but was not allowed to. McDaniel, 326 Ill. App. 3d at 776. Only after the defendant had given a statement was the mother allowed to visit the defendant. McDaniel, 326 Ill. App. 3d at 776.

The trial court admitted the statement, but the appellate court reversed the trial court's decision. The appellate court found that the trial court's factual determinations about whether the defendant's mother asked to see the defendant and tried to talk with him were against the manifest weight of the evidence. The appellate court also determined that, because the police testimony to the contrary was rebutted by the mother's presence and attempts to see and speak to the defendant, the police testimony was not credible. The appellate court then held that it would review the totality of the circumstances under the defendant's version of the events. McDaniel, 326 Ill. App. 3d at 780-81.

In reviewing the totality of the circumstances, the appellate court primarily considered the defendant's age and experience with law enforcement, the presence of a concerned adult or juvenile officer, and the time and nature of the defendant's arrest and interrogation. McDaniel, 326 Ill. App. 3d at 782-86. The appellate court determined that the defendant's young age and lack of previous experience with law enforcement weighed heavily against finding that his statement had been made voluntarily. McDaniel, 326 Ill. App. 3d at 782-83. The appellate court then determined that the police had actively frustrated the mother's attempt to confer with the defendant. Similarly, the appellate court found that the juvenile officer did not speak with the defendant, so her presence was of no value to the defendant in protecting his rights. The appellate court found that these factors too weighed heavily against finding that the defendant voluntarily made his statement. McDaniel, 326 Ill. App. 3d at 783-85. Last, the appellate court found that the 2 a.m. arrest and the lengthy, almost-six-hour detention before the interview contributed to the coercive nature of the defendant's

interrogation. McDaniel, 326 Ill. App. 3d at 785-86. The court held that the defendant's statement had to be suppressed. McDaniel, 326 Ill. App. 3d at 787.

Respondent here analogizes his circumstances to those of the defendant in McDaniel. In particular, he emphasizes his young age and lack of previous experience in dealing with law enforcement and the criminal justice system. Additionally, as we address in more detail below, respondent contends that, just as in McDaniel, the police here affirmatively prevented his mother from having access to him and from conferring with him before he was questioned by the police. We find McDaniel to be wholly distinguishable, however.

While the age and experience factors are the same, the police conduct in McDaniel was of an entirely different magnitude from the police conduct in this case. There, the police ignored the mother's requests to gain access to the defendant over a period of about six or seven hours. Here, the trial court determined, and this determination was not against the manifest weight of the evidence, that respondent's mother knew that respondent was being taken for questioning and she did not indicate to police that she wished to accompany them or otherwise try to contact respondent until after 11 p.m. In McDaniel, the juvenile officer did not even speak to the defendant. Here, by contrast, Garcia explained his role to respondent and made sure that respondent could understand what was going on. He also explained to respondent that he would take care of respondent's needs. Last, the circumstances of the arrest in McDaniel, early in the morning and a lengthy isolation before questioning commenced, contributed to the coerciveness of the interrogation. By contrast, here, respondent was taken to the NET offices in the late afternoon or early evening and questioning commenced directly, lasting until about 8:30 p.m. The trial court determined that the questioning

was not unduly long. These factual differences serve to render <u>McDaniel</u> wholly inapposite to this case.

In his examination of the totality of the circumstances, respondent concentrates particularly on the factors of parental access, the role of the juvenile officer, and the use of "interrogation tactics" in securing a statement. We consider each issue in detail.

Respondent argues that he was denied access to his mother, who demonstrated that she was a concerned parent, and that this constituted a significantly coercive factor in the totality of the circumstances that should have weighed heavily against finding that his statements were made voluntarily. Respondent concedes that the trial court found that Cilia's and Sanchez's testimony about the police refusing Cilia permission to accompany respondent to the police station was not credible. (We agree, having held that the trial court's finding was not against the manifest weight of the evidence.) However, respondent argues that the police never informed Cilia that they were taking respondent to be questioned about the Mendez shooting. According to respondent, this was police interference in the concerned parent's right to see her child before or during questioning, sufficient to constitute an important factor in a proper finding that respondent's statements were involuntary. In support, respondent cites to a half-dozen cases.

Most pertinent to respondent's contention is <u>Robinson</u>. There, the police informed the defendant's mother that she did not need to accompany the defendant to the police station, because they were just going to ask him a few questions. <u>Robinson</u>, 301 Ill. App. 3d at 638. Respondent equates this conduct to that of Flores and Garcia in telling Cilia that they were investigating a gang crime involving respondent's friends. According to respondent, this misleading statement was

compounded by Cilia's belief that the officers agreed to perform an intervention on respondent's behalf by finding him a program or boot camp to help respondent to disassociate from a gang.

While we agree that the officers did not disclose to Cilia the scope of the investigation, we note, and respondent concedes, that the police are under no affirmative obligation to disclose the entire scope of their investigation to a suspect or the suspect's parents. Minniti, 373 Ill. App. 3d at 72; People v. Brown, 301 Ill. App. 3d 995, 1003 (1998). Further, while Cilia may have been concerned about respondent's gang involvement and shared this concern with the officers, respondent concedes that the officers consistently testified that they informed Cilia that they were investigating some sort of incident and needed to speak to respondent about it. Given that the trial court found that Cilia's and Sanchez's testimony was not credible and that the police officers' testimony was, we conclude that the officers informed Cilia that they were seeking respondent to question him pursuant to an investigation. The trial court's conclusion, that Cilia was aware of the purpose behind the officers' seeking to question respondent, then, is not against the manifest weight of the evidence. Last, we note that the Robinson court was most troubled by the fact that the mother had demonstrated an interest in conferring with the defendant, asking if she needed to come to the police station and calling the station to speak to the defendant, but was put off by the police. Robinson, 301 Ill. App. 3d at 642. Here, by contrast, even if we accepted that Flores's statement that they were just questioning respondent discouraged Cilia from accompanying respondent, she gave no indication of interest until after 11 p.m., hours after the police had taken respondent in for questioning. (In Robinson, the mother called shortly after being refused permission to accompany the defendant, thereby again alerting the police that she was interested in conferring with him. Robinson, 301 Ill. App. 3d at 642. Here, Cilia gave the police no sign of interest until after 11 p.m.) Shortly after

Cilia's call, the police returned her call. Thus, the fact that Cilia exhibited no interest in conferring with respondent serves to render respondent's reliance on Robinson misplaced.

The remaining cases relied upon by respondent are also readily distinguishable. In G.O., the court held that the police did not frustrate the mother's attempt to confer with the respondent, and this holding is contrary to respondent's position here that the police frustrated Cilia from conferring with him. G.O., 191 Ill. 2d at 37. In People v. Griffin, 327 Ill. App. 3d 538, 545-46 (2002), the defendant's parents came to the station and were refused permission to confer with the defendant. The court concluded that the act of appearing at the station demonstrated to police the parents' interest so that the police refusal could be considered as a factor contributing to the coercive nature of the questioning. Griffin, 327 Ill. App. 3d at 546. Likewise, in McDaniel, 326 Ill. App. 3d at 784, People v. Golden, 323 Ill. App. 3d 892, 902 (2001), In re J.J.C., 294 Ill. App. 3d 227, 237 (1998), and In re Lashun H., 284 Ill. App. 3d 545, 551 (1996), the courts found that the parents of the minors demonstrated interest by physically coming to the station. Here, Cilia did not go to the police station or call the police station until well after respondent had talked to the police. Respondent also cites to People v. Kolakowski, 319 Ill. App. 3d 200, 213-14 (2001), in which the court found that the police had not prevented the father from conferring with the defendant, thus lending little support to respondent's argument.

The ability to confer with a parent is an important factor to consider in determining the voluntariness of a juvenile's statement. See, e.g., G.O., 191 Ill. 2d at 55. Here, however, the trial court's determination that the police did not frustrate Cilia from conferring with respondent is borne out by the facts that the officers (who were deemed credible) all testified that Cilia did not ask to

accompany them and that Cilia did not call the police station until after 11 p.m., after respondent had delivered his statements to the police. Accordingly, we find no merit to respondent's argument.

Respondent next focuses on the role of a juvenile officer during the interrogation of a minor suspect. According to respondent, Garcia did not fulfill his role as a juvenile officer for two reasons. First, respondent contends that Garcia did not demonstrate an interest in his welfare and affirmatively protect his rights. Second, respondent argues that, in fact, Garcia was in an adversarial role. Respondent notes that, in the days before the January 5, 2006, questioning of respondent, Garcia had actively investigated the Mendez shooting and had questioned several other witnesses as the lead detective. Based on this, respondent urges that, because Garcia was acting more like any other police officer than like a juvenile officer, we must find that he was acting in an adversarial and antagonistic role and not as a concerned adult. Respondent concludes that Garcia cannot be considered to have been a concerned adult and that the absence of a concerned adult rendered the questioning unduly coercive and cuts against a finding that respondent gave voluntary statements to the police.

We consider respondent's first contention about the general role of a juvenile officer. As is pertinent here, section 5--405 of the Juvenile Court Act of 1987 (705 ILCS 405/5--405 (West 2006)) commits an arrested minor to the care of a juvenile officer, but does not define the duties or responsibilities of the juvenile officer. (The provision mandates that the arresting officer shall attempt to notify the minor's parent or a responsible adult--this responsibility may also fall to the juvenile officer, but it is not expressly required of him or her.) Both respondent and the State note that, in the case law, the role of a juvenile officer is unclear. One line of cases suggests that the juvenile officer's role is primarily that of a physical guardian--the juvenile officer is to make sure that

the minor's parents have been notified about the minor's detention and questioning, to ensure that the minor is given <u>Miranda</u> warnings, and to ensure that the minor is properly treated, fed, allowed the use of the washroom, allowed to rest, and not coerced in any way. <u>Minniti</u>, 373 Ill. App. 3d at 73. The other line of cases appears to require the juvenile officer to assume the role of affirmative advocate--the juvenile officer may not be only a silent presence, but he or she must demonstrate an interest in the minor's welfare and affirmatively protect the minor's rights. <u>Minniti</u>, 373 Ill. App. 3d at 73. Respondent, in his argument, adopts for the juvenile officer the role of affirmative advocate; the State adopts the role of physical guardian. Neither party provides analysis or argument in support of the position each party has adopted--each party provides only a declaration of the line of cases the party prefers to follow.

It falls to us, therefore, to analyze the relative merits of each line of cases. We begin by noting that <u>Minniti</u> appears to be among the most recent cases to consider the issue of the role of the juvenile officer. <u>Minniti</u> also notes only that the juvenile officer's role is "unclear" and uses this lack of clarity to conclude that it cannot say that the juvenile officer did not fulfill his duties in that case. <u>Minniti</u>, 373 Ill. App. 3d at 73. Likewise, <u>Griffin</u>, 327 Ill. App. 3d at 547, identifies the same two lines of cases to support its comment that the role of the juvenile officer is unclear in Illinois. <u>Griffin</u> also does not resolve the difference in the two lines of cases, instead finding that the juvenile officer did not fulfill his duties under either the physical guardian or the affirmative advocate line of cases. <u>Griffin</u>, 327 Ill. App. 3d at 547. <u>Minniti</u> and <u>Griffin</u>, then, offer no guidance in distinguishing between the lines of cases.

Respondent points to <u>McDaniel</u> and <u>Robinson</u> as exemplifying the affirmative advocate position. In <u>McDaniel</u>, the court concluded that the record demonstrated that the juvenile officer

"showed no interest in protecting the defendant's rights"; the juvenile officer did not speak with the defendant's mother or the defendant, despite an opportunity to do so, and the juvenile officer made no comments during the defendant's interrogation. McDaniel, 326 Ill. App. 3d at 785. In Robinson, the defendant was not allowed to meet with a juvenile officer at all and, particularly, not before questioning commenced. Robinson, 301 Ill. App. 3d at 642. The court in Robinson drew guidance from J.J.C., 294 Ill. App. 3d at 237, which held that a defendant's confession was not voluntary where, among other factors, the "record did not indicate that the [juvenile] officer had affirmatively protected [the minor's] rights." Robinson, 301 Ill. App. 3d at 641. J.J.C., in turn, noted that, while there was a juvenile officer present with the minor during his interrogation, "the record [was] silent of indicia on the part of the [juvenile] officer affirmatively protecting [the minor's] rights." J.J.C., 294 Ill. App. 3d at 237.

On the other hand, People v. Williams, 324 Ill. App. 3d 419 (2001), and Kolakowski are offered as leading examples of the physical guardian line of cases. In Williams, the court rejected the notion that a juvenile officer must affirmatively protect a minor's rights. Instead, it found that the juvenile officer's presence, his observation that the defendant received proper Miranda warnings, and his asking the defendant questions eliciting basic information, all served as factors in favor of finding that the defendant's confession was voluntary. Williams, 324 Ill. App. 3d at 429-30. Kolakowski held that, by contacting the minor's parents, being present during questioning, and making sure that the minor's physical needs were met and the minor was properly treated, the juvenile officer properly fulfilled his role. Kolakowski, 319 Ill. App. 3d at 213. In People v. Plummer, 306 Ill. App. 3d 574, 588 (1999), the court examined a number of cases commenting on

the propriety of the actions undertaken by juvenile officers and the roles the juvenile officers should fulfill. Following this review, the court held:

"Consistent with the holding in [People v. Brown, 182 Ill. App. 3d 1046, 1053-54 (1989)], youth officers should be required to verify whether a juvenile's parent or other significant adult has been notified of the presence of the juvenile and to determine if the parent wishes to confer with the juvenile prior to questioning. If the parent indicates he or she wishes to confer with the juvenile, the youth officer should see that questioning ceases until they can confer. Consistent with the holding in [People v. Bobe, 227 Ill. App. 3d 681, 701-02 (1992)], youth officers should be required to verify with the juvenile that he has been given his rights under Miranda and understands that he may be tried as an adult if that is the case. Consistent with common sense, youth officers should be required to see to it that juveniles are properly treated--that they are fed, allowed to rest if needed, given access to washroom facilities, are not held in a confined space with adult suspects, and that they are not coerced in any way." Plummer, 306 Ill. App. 3d at 588.

We find the rationale explained in Plummer to be persuasive and pragmatic. It seems to cut a fair balance between the need to protect minors from the coercive aspects of police contact while freeing the juvenile officer from the necessity of actively conflicting with his or her other duties as a police officer. By this, we mean to note that there is an inherent conflict between the role of a police officer investigating a crime and that of a juvenile officer, who is tasked (at least under McDaniel and Robinson) with affirmatively protecting a suspect under investigation by the police. See G.O., 191 Ill. 2d at 70-71 (McMorrow, J., dissenting) (noting that the inevitable conflict, where the juvenile officer serves both the State and the minor, raises the possibility that the juvenile officer

may not represent the minor's rights with the vigor of a family member or of an attorney with a fiduciary duty to the minor). The physical guardian role--notifying a concerned adult, making sure the minor receives Miranda warnings, making sure the minor's physical needs are met, and making sure he or she is well treated--is a clear and readily achievable standard. The affirmative advocate role--affirmatively protecting the minor's rights--seems to require the juvenile officer to intercede at the outset of questioning and terminate the interview in order to serve the minor's best interest. This is too great and unreasonable a burden to place on a juvenile officer, who is, after all, trying to appropriately serve two masters: the State and the minor.

That the physical guardian role is preferred is also demonstrated by considering the law. It has long been the law that a juvenile officer is not required to meet with a minor before the police begin questioning or to be present during questioning. Plummer, 306 Ill. App. 3d at 586. If a juvenile officer were required to actively protect the minor's rights, then the fact that a minor is not required to meet with a juvenile officer is incomprehensible and bizarre. Surely, if the juvenile officer's role were akin to that of a family member or lawyer-advocate, then the police would be required to allow the juvenile to meet with the juvenile officer. Similarly, the fact that the juvenile officer's presence is not required gives rise to the inference that the juvenile officer's responsibility is centered on the role of physical guardian--protecting the physical person of the minor and ascertaining that the police are not improperly taking advantage of the minor's youth in attempting to wring a confession from him or her.

Additionally, the appellate court in In re G.O., 304 Ill. App. 3d 719, 733 (1999), adopted a position closer to that of the affirmative advocate role of juvenile officers. The supreme court reversed and found that the record indicated that the minor's mother was contacted, the minor

received repeated Miranda warnings, the minor was not maltreated, and the minor was provided soda and allowed to use the bathroom upon request. G.O., 191 Ill. 2d at 56. While the supreme court did not hold that this was to be the juvenile officer's role, we find it significant that it reversed a suppression order based, in part, on the fact that the juvenile officer did not affirmatively protect the minor's rights while it effectively determined that the duties of the juvenile officer, under the physical guardian line of cases, had been fulfilled.

A final point. The affirmative advocate cases criticized juvenile officers for doing nothing. McDaniel, 326 Ill. App. 3d at 785; G.O., 304 Ill. App. 3d at 733; Robinson, 301 Ill. App. 3d at 642; J.J.C., 294 Ill. App. 3d at 237. While we do not purport to say that all of the affirmative advocate cases arose where the juvenile officers did nothing, when we view the adjuration to affirmatively protect the minor's rights in the factual context of having done nothing, it seems reasonable that the duties in the physical guardian line of cases could well satisfy the affirmative advocate requirement. In other words, we believe, based on our sampling of the case law, that the holdings of the two lines of cases may not be different at all. Rather, the affirmative advocate line arose as criticism where the juvenile officer failed to do anything to help the minor; the physical guardian line arose as explained in Plummer--a consideration of what a juvenile officer should do in the difficult circumstances of trying to serve the two masters in the State and the minor. Thus, while the juvenile officer's role is "unclear," the factual context must be kept in mind in determining whether there is a real difference between the two lines of cases that appear to be present in Illinois law.

In sum, then, in light of the realities of the position of the juvenile officer, and the relatively more persuasive rationale of the physical guardian line of cases, we choose to follow the Williams-Kolakowski line of cases in reviewing Garcia's conduct in this case.

The record demonstrates that Garcia met respondent's mother and that she was informed that the police were looking to question respondent about a gang-related crime. The trial court held that Cilia understood the purpose and that she consented to the contact. This finding is not against the manifest weight of the evidence. Thus, Garcia fulfilled his duty to contact a parent or a concerned adult.

Garcia observed Ulloa administer <u>Miranda</u> warnings using a preprinted sheet and observed respondent sign the waiver form. Additionally, Garcia spoke to respondent and informed him that Garcia was a juvenile officer who would answer respondent's questions and see that he was not mistreated. Garcia also asked respondent some basic questions and formed the opinion that respondent was able to understand what was happening. Thus, Garcia fulfilled his duty to make sure that the minor had been given proper <u>Miranda</u> warnings.

Garcia was also present during the interview. He testified that Ulloa did not raise his voice or threaten or strike respondent. The record further demonstrates that Garcia told respondent he could ask for anything he needed, food, drink, or to use the restroom, but that respondent did not request anything. Garcia thus fulfilled his duties to make sure the minor was properly treated. Based on the foregoing, we agree with the trial court that Garcia appropriately fulfilled his duties as a juvenile officer. For the reasons expressed above, we reject respondent's contention regarding the necessity that a juvenile officer affirmatively protect a minor's rights.

Respondent also challenges Garcia's conduct on the basis that he was actively involved in the investigation of the Mendez shooting. Respondent points to <u>Griffin</u> for the proposition that a juvenile officer cannot have been involved in investigating the minor and still perform the role of juvenile officer for the minor. Specifically, <u>Griffin</u> held: "Youth officers cannot act in their role as

a concerned adult while at the same time actively compiling evidence against that juvenile." Griffin, 327 Ill. App. 3d at 547-48. Respondent argues that, because Garcia interviewed witnesses in the Mendez shooting as the lead detective, he could not subsequently fulfill the role of juvenile officer. We disagree.

Griffin involved a police officer who, at the same time he was acting as the defendant's juvenile officer, was also interviewing witnesses, visiting the crime scene, and conducting a search of a codefendant's house. Griffin, 327 Ill. App. 3d at 548. It was the simultaneous engagement in duties as both a police officer and a juvenile officer that the Griffin court disapproved. By contrast, here, the record does not indicate that, while acting as respondent's juvenile officer, Garcia engaged in any investigative conduct related to the Mendez shooting. He functioned only as respondent's juvenile officer during that time. We find Griffin, therefore, to be distinguishable, and respondent's reliance on it is misplaced.

Instead, we follow People v. Haynie, 347 Ill. App. 3d 650, 654 (2004). In that case, the defendant complained that the juvenile officer acted as an investigator and that this rendered his role as a juvenile officer meaningless. The court rejected the defendant's argument. Instead it found that the officer had initially participated in the investigation by interviewing witnesses and conducting lineups. The court noted, however, that the officer's role changed to juvenile officer once the defendant was brought into the police station. Haynie, 347 Ill. App. 3d at 654. The court noted that the officer contacted the defendant's mother, ensured that the defendant was given Miranda warnings, kept the defendant separated from adult offenders, and ensured that the defendant was not coerced. The court concluded that the officer, despite having participated in some investigative activities in the defendant's case, properly fulfilled his role as juvenile officer later on when the defendant was

brought to the station. Haynie, 347 Ill. App. 3d at 654. Likewise here. Garcia participated in investigating the Mendez shooting before January 5, 2006, the date of respondent's questioning. There is nothing in the record to suggest that he continued actively investigating the crime on or after January 5 or, particularly, once the questioning of respondent began. Even if, however, Garcia engaged in investigative duties at some point on or after January 5, the record is without doubt that these hypothetical investigative duties did not occur simultaneously with the questioning of respondent and thus did not taint his statement. We emphasize that we read Griffin to forbid a juvenile officer to engage in investigative conduct simultaneously while he is acting as a juvenile officer in the same case. Because there is no showing in the record at all that Garcia engaged in investigative conduct in this case at the same time he was acting as respondent's juvenile officer, this case falls under the ambit of Haynie, 347 Ill. App. 3d at 654. We have held above that Garcia fulfilled the duties of a juvenile officer for respondent. Accordingly, we hold that Garcia's earlier participation in the investigation did not disqualify him from acting as a juvenile officer for respondent. See Haynie, 347 Ill. App. 3d at 654; see also People v. Johnson, 368 Ill. App. 3d 1073, 1090 (2006) (rejecting the defendant's contentions that the juvenile officers may have questioned the defendant and did not object to fabricated and overstated statements about the evidence against the defendant; holding, "We do not believe that the conduct of either juvenile officer during the interrogation of the defendant was improper").

Respondent's final contention is that his statements were the product of police trickery. Respondent notes that Ulloa freely admitted that he employed "interrogation tactics" in eliciting the statements from respondent. According to respondent, Ulloa overstated the evidence against respondent when he told him that "several witnesses" had implicated him in the Mendez shooting.

Respondent argues that the witnesses, Tellez and Raquel Garcia, were of dubious veracity and quality. Respondent argues that Ulloa's statements about the several witnesses misled him, especially when Officer Garcia, his supposed advocate, did not challenge it. We disagree.

First, we note that respondent's argument relies on the position that he was lulled by Garcia's supposed duty to affirmatively protect his rights and advocate on his behalf. We have already determined that Garcia was under no such obligation. To the extent, then, that respondent claims coercion because Garcia did not object, we reject his argument.

Additionally, we do not believe that respondent's statements were due to police trickery. "Trickery involves affirmative acts of fraud or deceit." Minniti, 373 Ill. App. 3d at 70. A respondent's statements must not result from deceptive interrogation tactics calculated to overcome the respondent's free will. Minniti, 373 Ill. App. 3d at 70. However, police trickery or deception will not invalidate a minor's statement as a matter of law, but is only one factor to consider in the totality of the circumstances. Johnson, 368 Ill. App. 3d at 1088-89. Here, Ulloa told respondent that several witnesses implicated him in the shooting. In fact, only two witnesses had implicated him. The difference between "two" and "several" is not sufficient to transform the interrogation tactic into trickery.

We note further that, in Minniti, the police told the defendant, falsely, that they had satellite images showing someone going from the defendant's home to the scene of the crime. The police also told the defendant that they found DNA evidence, matching him, inside the victim. Minniti, 373 Ill. App. 3d at 69. In fact, the police had DNA evidence linking the defendant to the crime, just not from inside the victim. Minniti, 373 Ill. App. 3d at 71. The court held that these deceptions did not rise to the level necessary to overbear the defendant's free will. Minniti, 373 Ill. App. 3d at 72. Here,

the "deception" is much more innocuous than that in Minniti. The police did not make up any evidence. At most, they slightly overstated the number of witnesses who implicated respondent-- saying "several" instead of "two." Likewise, in Johnson, the police officer told the defendant that his fingerprints had been found on the murder weapon and that "several" people had implicated him in the crime. Johnson, 368 Ill. App. 3d at 1088-89. The defendant continued to maintain that he was innocent after each of these deceptive statements, and the court concluded that the police conduct did not render the defendant's ultimate statement involuntary. Johnson, 368 Ill. App. 3d at 1088-89. Here, the police conduct is much less deceptive than that in Johnson. The police had two statements implicating respondent and told him that "several" people had implicated him in the shooting, and they did not tell respondent that they had nonexistent evidence in order to put pressure on him to make a statement. Any police trickery or deception here was minimal and does not even rise to the level of that found unexceptionable in Minniti and Johnson.

Respondent argues that the witnesses were likely to have committed the crime themselves and that police should not have relied upon their statements to implicate him. We are not entirely sure where respondent is going with this argument. As noted above, respondent made a substantially similar argument in a motion to quash his arrest and suppress evidence, which was denied. Respondent is not appealing the trial court's decision on the motion to quash and suppress. To the extent that respondent is contending that the police overstated the strength of the evidence, we do not believe that their conduct rises to the level of trickery, as the witnesses' statements were held to support probable cause to take respondent into custody and question him. Further, Tellez and Raquel Garcia made the statements. The statements implicated respondent. Respondent ultimately gave

inculpatory statements to the police that are, in fact, consistent with the statements made by Tellez and Raquel Garcia.  Respondent's contention is without merit.

We have considered respondent's specific arguments about the particular factors of parental access, the role and conduct of the juvenile officer, and the use of interrogation tactics in securing a statement, and we have concluded that the trial court did not err in holding that the factors favored a finding that respondent gave his statements to police voluntarily.  Further, based on our review of the record, we have concluded that, under the totality of the circumstances, respondent's statements were given voluntarily.  Accordingly, we affirm the judgment of the circuit court of Lake County.

Affirmed.

GILLERAN JOHNSON, P.J., and CALLUM, J., concur.