NO. 4-08-0435      Filed 8/10/10

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: AUSTIN M., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Ford County |
| v. | ) | No. 06JD17 |
| AUSTIN M., | ) | |
| Respondent-Appellant. | ) | Honorable |
| | ) | Stephen R. Pacey, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MYERSCOUGH delivered the opinion of the court:

Following a hearing occurring in January and April 2007, the trial court adjudicated respondent, Austin M., delinquent based on misdemeanor criminal sexual abuse (720 ILCS 5/12-15(b) (West 2006)) and sentenced him to 24 months' probation. In February 2008, respondent filed a motion for a new trial, which the court denied in May 2008.

Respondent appeals, arguing (1) he was deprived of effective assistance of counsel when his attorney (a) labored under per se and actual conflicts of interest, (b) failed to challenge hearsay statements at trial, (c) failed to cross-examine three primary witnesses, and (d) failed to file a motion

to suppress respondent's statement to police; (2) he was deprived of his right to counsel when his attorney served as both guardian ad litem and defense counsel; and (3) the State failed to prove him guilty beyond a reasonable doubt. We disagree and affirm.

I. BACKGROUND

In July 2005, respondent (born September 6, 1989) lived with his parents (the Ms); two older sisters, Ab.M., and J.M.; two older brothers, C.M. and An.M.; and one younger brother, R.M. (born October 1, 1990). An.M. was the Ms' biological child, and the other children were adopted when they were very young and are not biologically related to each other.

The following year, respondent's parents took in three male foster children, J.L. (born December 10, 1993); D.L. (born May 24, 1996); and W.C. (born September 16, 2000). In July 2006, Sheree Foley, a Department of Child and Family Services (DCFS) investigator, received a hot-line tip that respondent and R.M. engaged in "inappropriate sexual behavior" with D.L. Foley informed the police, and the State later charged both respondent and R.M. with misdemeanor criminal sexual abuse (720 ILCS 5/12-15(b) (West 2006)) based on "numerous occasions" occurring between July 14, 2005, and July 14, 2006, and involving sexual

- 2 -

penetration and additional sexual conduct with D.L., J.L., and each other.

A. Pretrial Proceedings

Respondent and R.M.'s parents hired attorney Anthony Novak to represent both children. In September 2006, the trial court held a pretrial hearing, at which it informed the boys' parents as follows:

"Mr. Novak is entering an appearance for your

sons only. So, he represents them and does

not represent you. He represents what's in

the best interest of these [m]inors, which

may or may not be what the [m]inors or the

parents think is in their best interests."

The parents indicated they had no questions regarding the proceedings.

B. Respondent and R.M.'s Adjudicatory Hearing

In January and April 2007, the trial court conducted a joint adjudicatory hearing as to respondent and R.M. Prior to the start of the hearing, attorney Novak noted as follows:

"We have three witnesses that are children,

[W.C., J.L., and D.L.], and I have agreed

with [the State's Attorney] that I am going

to not oppose their testimony being presented by way of [videotape.] Judge, a couple of [videotapes were] made in July, and one [was] made in October.

*** I want to make it clear; my clients have consistently denied the allegations that are being made by these complaints ***.

Nevertheless, this is a juvenile hearing. I have talked this over pretty carefully with my clients, as well as with their parents, and I have been a lawyer for nearly 30 years, and I am comfortable with this in this case because [']we want to know the truth['] is ultimately the view of the parents. If something along the nature of these allegations, which are acts of sexual penetration involving children ***. And I think our[] *** attitude is we have grave doubts these things occurred.

The boys deny [this] occurred, but I think the parents and I agree with--I think with [the State's Attorney] as well that if

such acts happened, then it needs to stop.
An intervention is not appropriate by way of
government to help these boys if such things
happened. ***  I have a duty to these boys,
nobody else. *** [W]e are seeking the
truth[,] *** the same as the [c]ourt and the
same as the prosecutor ***.  And I am
comfortable with proceeding by way of the
[videotape] as opposed to requiring these
young children to come into [c]ourt at this
hearing ***.  We are giving up our right to
confront these witnesses in [c]ourt.

* * *

And on the other hand, [the State's
Attorney] is giving up the ability to have
live testimony[,] which tends to be more
persuasive than [videotape]."

Attorney Novak further explained his representation of both
clients, stating as follows:

"[O]rdinarily, if this were an adult case
***[,] it is extremely rare I would contest a
hearing attempting to represent two

- 5 -

individual clients that deserve the benefit
of individual representation, separate
consideration, and the allegations are kind
of--they are pretty widespread.

    We are talking about a year's period of
time and *** different possible alleged acts
of different kinds.  Nevertheless, I think
[at] a juvenile hearing where it is a
misdemeanor allegation, where it is a [j]udge
proceeding as opposed to a [j]ury proceeding,
I am fully capable of handling this, and ***
I don't view such a proceeding as adversarial
as it might be if it were an adult
proceeding."

Thereafter, the court informed the boys and their
parents of the following:

    "[T]here are several things now that you are
    basically agreeing that there will not be any
    objection to or complaint about or any issue
    raised at a later date.  In effect, you are
    waiving any claim of error or objection in
    three different areas now.  *** [Y]ou will

not be able to complain about the timeliness of this hearing because you have on a couple of occasions waived or given up the right to claim that it wasn't timely held.  ***

Second, you are now given the right to cross-examine or ask questions of these three witnesses who appear by [videotape].  *** [Y]ou have an absolute right to confront and cross-examine or ask questions of all the witnesses. ***

And third, you are giving up the right to make any objections about the fact that Mr. Novak is representing both of the [m]inor [r]espondents that somehow this was a conflict or that he didn't adequately represent both of them or one person was better represented than the other or that the defense of one is that the other did it ***."

The court asked the parents, respondent, and R.M. if they understood "those three areas," and all responded individually in the affirmative.  When asked by the court if attorney Novak discussed the above with respondent and his brother, Novak

stated, "I am not sure I explained about the interest between the two."  The court then explained the concept of conflict of interest to respondent and R.M., after which both indicated they understood.  Novak also told the court that in exchange for permitting admission of the videotaped interviews, the State's Attorney agreed to pursue probation with sexual-abuse treatment rather than commitment to the Department of Juvenile Justice.  The court asked the boys' parents if they understood the compromise but did not ask if respondent or R.M. also understood.

The trial court then began the hearing, wherein the parties presented the following evidence.

### 1. The State's Evidence

#### a. Testimony of Sergeant Yates

Sergeant Robert Yates testified he worked as a sergeant with the Paxton police department.  In July 2006, he received information from DCFS investigator Foley pertaining to a possible criminal sexual assault of D.L.  According to the DCFS report, two of the foster parents' children--respondent, then age 16, and R.M., then age 15--were the alleged perpetrators.  When DCFS received the report, D.L. no longer lived with the Ms, but two younger foster children, W.C. and J.L., continued to live at the Ms' home.

Sergeant Yates and Foley brought W.C. and J.L. to the Paxton police station for questioning.  Although Sergeant Yates did not remain in the room with the children during the questioning, Foley later provided him with information she obtained during the interviews.

Following W.C.'s and J.L.'s interviews, Sergeant Yates phoned the Ms, and they agreed to bring respondent and R.M. to the station for questioning.  First, Sergeant Yates questioned R.M. in front of R.M.'s father, Foley, and the Paxton police chief.  R.M. appeared "extremely nervous," avoided eye contact, and repeatedly denied touching anyone inappropriately.

Next, Sergeant Yates interviewed respondent.  Sergeant Yates testified that Foley, the police chief, and respondent's father remained in the interrogation room.  Initially, respondent denied partaking in any inappropriate touching.  Sergeant Yates and others present during the interview told respondent several times they "had received information otherwise."  "[A]t some point," respondent told police that he observed J.L. having sexual contact with the family dog.  Respondent then admitted allowing D.L. to "suck his dick" after D.L. asked if he could "do things to him."  After respondent made this statement, respondent's father ended the interview and told police he

wanted an attorney.

Following respondent's interview, Sergeant Yates accompanied Foley to the Child Advocacy Center (CAC) in Urbana, where Foley interviewed D.L. and W.C. Although present at CAC, Sergeant Yates was not involved with any questioning. Prior to the hearing, he reviewed the videotapes and audiotapes of both D.L.'s and W.C.'s interviews as well as a later interview with J.L. in October 2006, at which Sergeant Yates was not present. The State admitted the tapes into evidence as exhibit Nos. 1, 2, and 3.

b. Testimony of Investigator Foley

Next, the State offered testimony from DCFS investigator Sheree Foley. Foley testified she "had extensive training" and experience as a forensic interviewer for sexual abuse. In July 2006, Foley received a hot-line report that respondent and R.M. sexually abused D.L. At the time of the allegation, D.L. lived with his grandmother, but his removal from the Ms' home was not connected to any allegations of sexual abuse. Upon receiving the hot-line report, Foley contacted the Paxton police department. She and the police agreed to bring the two foster children remaining in the Ms' home, J.L. and W.C., in for questioning.

Foley picked the boys up and interviewed them at the police station. Once Foley "had information from the boys that sexual abuse *** did occur in the home," police brought in respondent and R.M. for questioning. Foley sat in on respondent's and R.M.'s interviews but did not question either. Foley observed R.M. was "scared and nervous" and maintained he did not partake in any inappropriate sexual conduct. During respondent's interview, respondent told police he allowed D.L. to "suck his dick." Respondent's father then cut off D.L. and terminated the interview.

Following respondent's statements, Foley made arrangements to remove W.C. and J.L. from foster placement with the Ms and conduct further interviews with the boys at CAC. Foley interviewed W.C. in July 2006. Foley waited until October 2006 to conduct an in-depth interview with J.L. because "he was very closed [off] and wasn't going to talk [in July 2006]."

Foley learned through another DCFS caseworker that D.L. had a history of inappropriate sexual behavior toward his cousins and had been sexually abused himself prior to living with the Ms. She also discovered through her interview with J.L. at CAC that he too had a history of being sexually abused.

On cross-examination, Foley attested that prior to the

- 11 -

July 2006 hot-line tip, two unfounded reports of abuse were made on D.L.'s behalf.

### c. Videotaped Interview of D.L.

On July 15, 2006, Foley conducted a videotaped interview with D.L. at CAC, which was admitted into evidence as People's exhibit No. 1.  During his interview, D.L. told Foley that he saw respondent and R.M. "humping" or "having sex" with their sisters, J.M. and Ab.M., in their bedrooms.

D.L. also stated that respondent and R.M. frequently babysat the younger children.  While babysitting, both boys frequently came into D.L.'s room, undressed, and threatened to "kill" D.L. if he did not "suck their dicks."  D.L. initially refused but eventually agreed to do so.  This happened multiple times.  D.L. stated he would suck until "white stuff" came out and afterward he would spit it out.  Previously, when D.L. was younger, he saw his biological mother do the same to his uncle.

D.L. also told Foley respondent and R.M. forced J.L. to perform oral sex on them and W.C. to "jack off" in front of them.  This occurred in D.L., J.L., and W.C.'s shared bedroom, in respondent and R.M.'s shared bedroom, and in the family van. Initially, D.L. stated he saw J.L. perform oral sex "just once" but later said it happened frequently.

According to D.L., his foster parents and one of his foster sisters hit him repeatedly, and on several occasions, R.M. "stuck his dick in [D.L.'s] butt," which hurt D.L. Occasionally, R.M. and respondent wore condoms, and on one occasion, R.M. forced D.L. to put a condom on him.

D.L. never told his foster parents of R.M.'s and respondent's behavior because they "didn't care."

d. Videotaped Interview of W.C.

Foley also interviewed W.C. at CAC on July 15, 2006. The State admitted the video of the interview as exhibit No. 3.

The video reveals W.C. initially said nothing about sexual abuse occurring within the Ms' home but further questioning revealed that W.C. told Foley he observed respondent touch J.L.'s and R.M.'s "pee pees." W.C. elaborated that respondent touched R.M. "for a long time," moving his hand "up and down." In doing so, respondent made R.M. "pee," which W.C. said was "yellow and white" in color. Although this occurred in another room, W.C. could see it from his bedroom.

W.C. further stated respondent touched J.L.'s penis while lying naked atop J.L.'s bed. On a separate occasion, J.L. and respondent took their pants off to allow the family dog to "lick their boot[ies]."

Finally, W.C. discussed C.M., the Ms' adult son.  W.C. alleged that C.M. took his pants down in front of W.C. to show J.M. "the hair on his pee pee."  W.C. also stated C.M. licked W.C.'s penis.

### e. Videotaped Interview of J.L.

On October 27, 2006, Foley interviewed J.L. at CAC, the video of which was admitted as People's exhibit No. 2.  J.L. told Foley D.L. would use the family dog for sexual purposes, taking the dog upstairs to a private room and allowing the dog to lick him.  J.L. told Foley he "didn't remember" anything suspect occurring between respondent and D.L.  However, after additional questioning from Foley, J.L. recalled walking in on D.L. "suck[ing] on [respondent's] penis."  This happened "more than one time."

J.L. initially stated that he never saw anyone else acting inappropriately but after further questioning admitted he saw respondent attempt to touch J.M.'s vagina over her clothing and that J.M. would "smack" respondent away.  J.L. also admitted R.M. and respondent would ask him to "suck on [their] dick[s]" but J.L. "always refused."  Respondent frequently tried to grab J.L.'s penis and threatened to "cut it off" with his pocketknife.  At one point, J.L. saw D.L. "suck on [R.M.'s]

- 14 -

dick" while respondent recorded them on a video camera. He also saw R.M. stick his penis "up [D.L.]'s butt" while in J.L.'s bedroom. Respondent tried to do the same to J.L., but J.L. "wouldn't let him." This sort of behavior happened "every day."

No one ever told the foster parents what was happening in the home. J.L. opined that the children remained silent about the inappropriate sexual behavior because the Ms did nothing when the children told on each other for hitting. He also stated the Ms told the children they would "beat them" if "they told."

### 2. Respondent and R.M.'s Evidence

After playing the three videotaped interviews, the State rested. Novak made a motion for a directed finding, which the trial court denied, and presented the following evidence.

### a. Testimony of An.M.

An.M. is the 22-year-old biological son of the Ms and the brother of respondent and R.M. At the time of the incidents in question, An.M. lived at home with the Ms. An.M.'s bedroom was on the second floor, next to the stairwell leading up to the bedroom in the attic shared by respondent and R.M. The foster children's bedroom was on the second floor. Although the Ms did not allow the younger children to go upstairs to the attic, the

children occasionally did so to play pool or watch television. When this happened, An.M. would go up and tell them to return downstairs.

On cross-examination, An.M. stated he spent most weekdays away from home at the University of Illinois, where he was a student. "[A]bout one evening a week," he would stay at school until around 8 p.m., but usually he arrived home around 4 p.m. When he was at school, An.M. admitted he did not know what went on at home. He further stated although his parents made a rule that no one could go into someone else's room without asking first, the rooms were not locked. An.M. rejected the State's suggestions that R.M. and respondent associated frequently with D.L., J.L., and W.C.

b. Testimony of Ab.M.

Ab.M. is the Ms' 19-year-old adopted daughter and sister of respondent and R.M. She lived at the Ms' home until January 2006, moved out, and then returned in May 2006.

Ab.M. denied having any sexual contact with respondent and R.M. However, one morning, she awoke to D.L. standing over her bed, watching her. On several occasions, she caught D.L. and J.L. in the bathroom together naked.

During cross-examination, Ab.M. denied that her sis-

ter, J.M., had a sexual relationship with respondent.  She stated W.C. previously lied on "several accounts" but could not pinpoint exactly when.  She also admitted she did not want respondent and R.M. to get in trouble.

### c. Testimony of Mrs. M.

Mrs. M. testified that she has three biological children--An.M., N.M., and S.M.--all of whom were adults, and five adopted children--C.M., Ab.M., J.M., R.M., and respondent. For 19 years, she acted as a foster mother for countless children.

Mrs. M. was concerned about the allegations against respondent and R.M. and wanted to know the truth, not involve herself in any coverup.  After learning of the allegations, Mrs. M. spoke with respondent and R.M. "many, many times," even trying to "trick" the boys into saying "something," but both "always stuck to [saying] this has never happened."

Mrs. M. denied leaving D.L., J.L., and W.C. under respondent's or R.M.'s supervision.  She also denied that respondent and R.M. had pocketknives, reasoning that knives were banned in the house and had either boy carried a knife, she would have found it in their pockets while doing laundry.

Mrs. M. further testified she never saw any indication

of sexual activity involving R.M., respondent, and the other children but expressed concern about activity between D.L. and J.L.  D.L. had a history of being molested prior to coming to live with the Ms.  After a counseling session, Mrs. M. arrived to pick up D.L. and found him naked in the parking lot.  Mrs. M. later found D.L. and J.L. in bed together.  Although the boys claimed "nothing was going on," Mrs. M. had D.L. sleep in a separate room that night under her supervision.  Mrs. M. also corroborated Ab.M.'s testimony that D.L. appeared naked in her bedroom shortly after arriving to live with the Ms.

After learning of the allegations against respondent and R.M., Mrs. M. watched the videotapes of Foley's interviews with J.L., D.L., and W.C. and then checked her home for evidence of sexual misconduct.  Mrs. M. refuted J.L.'s allegation that he watched respondent videotaping R.M. having oral sex with D.L. by checking the family's digital video camera and discovering no recordings of any sexual activity.  She further refuted D.L.'s claims that R.M. forced him to perform oral sex in the family van, noting that she never left the children alone in the van because she worried about the boys fighting.  She denied D.L.'s claims that she ever hit him and stated none of the children ever told her of the alleged sexual abuse occurring within her

- 18 -

home.  Had she received any reports from her children of sexual activity, she would have reacted "strong[ly]."

On cross-examination, Mrs. M. testified that the boys were supervised 24 hours a day.  She banned all of the children from going into each other's rooms and strictly enforced this rule.  Although Mrs. M. initially denied any report of sexual abuse prior to the allegations in the instant case, she later admitted that when respondent was six, he was accused of sexually abusing a neighbor child and received a sexual evaluation in connection with the accusation.  Over Novak's hearsay and relevancy objections, Mrs. M. also acknowledged hearing some allegations about respondent acting sexually inappropriate with J.M. and another allegation involving respondent's classmate.

d. Testimony of Mr. M.

Mr. M. testified he was present for respondent's and R.M.'s July 2006 interviews at the Paxton police station.  Mr. M. described the interview as follows:

> "We went into the interview room.  *** [Respondent] was asked and then I was asked to sign a form that was basically his <u>Miranda</u> rights.  Then [the police] started to ask him about knowing [of] any inappropriate sexual

- 19 -

behavior that went on in our house, and he said he didn't know. They asked him that question several times, and he responded negatively. *** [One officer] was sitting across from [respondent.] He asked him if [D.L.] ever performed oral sex *** on him. [Respondent] did not respond. Then [the police captain] who was standing in the corner of the room yelled at him, [']did [D.L.] perform oral sex on you[?'] and he still didn't respond, and at that point I thought that was abusive, and I asked that the interview end. [The police captain] kept talking, so I could see that the interview was not ending. At that point, *** I stated that we needed a lawyer, and then the interview ended."

Mr. M. further denied hearing respondent say he had oral sex with D.L. Mr. M. stated R.M.'s interview was similar in tenor, with the police captain "ridicul[ing]" R.M. and "basically call[ing] him a liar." According to Mr. M., both boys never made any statements involving inappropriate conduct with the

- 20 -

family dog.

Mr. M. also corroborated Mrs. M.'s testimony about the lack of pocketknives in the home, the fact the boys were never alone in the Ms' van, and that none of the children were left home alone under respondent's or R.M.'s supervision.

At the close of evidence, the trial court took the matter under advisement.

C. The Trial Court's Ruling

In August 2007, the trial court issued a written ruling in which it denied the State's delinquency petition as to correspondent R.M. but found respondent guilty of criminal sexual abuse (720 ILCS 5/12-15(b) (West 2006)) and adjudicated him delinquent.  The court explained the five-month delay in its decision by noting it "ha[d] both procrastinated and struggled evaluating the credibility of witnesses *** and reaching a final decision. [The court] ha[d] reviewed its trial notes and the [videotaped interviews] multiple times."

In support of its ruling, the trial court made the following findings: (1) Sergeant Yates's and Investigator Foley's testimony about why the minors' nervousness was normal in the context of police questioning and not indicative of guilt; (2) the Ms' household rule prohibiting the children from

going into each other's rooms was not unusual; (3) W.C.'s video-taped testimony lacked credibility because (a) Foley prompted his answers, (b) his responses were inconsistent regarding the locations of the incidents he described and whether he witnessed the incidents personally, (c) he accused C.M. of sexual misconduct, although none of the other children mentioned C.M. as engaging in such conduct, and (d) he misstated who lived at the Ms' during the time period in question; (4) J.L.'s videotaped testimony was "only slightly more credible" because (a) he "related only sexual misconduct by the *** other two foster children witnesses," (b) the audio of his interview was of poor quality, and (c) he only admitted sexual misconduct after prompting and suggestions from Foley; and (5) D.L.'s videotaped testimony "was also suspect" in that he claimed (a) respondent and R.M. had group sex with their sisters, (b) he performed oral sex on respondent and R.M. "all the time" in their attic bedroom and D.L.'s own bedroom after they threatened to kill D.L., (c) he had anal sex with R.M., and (d) Mrs. M. occasionally hit him "everywhere." The court concluded "this is the classic case where the State has introduced evidence sufficient to prove that something probably happened[] but[,] absent an admission, not proof beyond a reasonable doubt." With respect to respondent,

the court noted "this is also[] *** a case in which [respondent's] admission has been proved beyond a reasonable doubt and, together with the State's other evidence, is sufficient to meet the State's burden."

### D. Respondent's Motion for a New Trial

In February 2008, respondent replaced Novak with Harvey Welch as defense counsel and filed a motion for a new trial arguing (1) the State failed to prove respondent guilty beyond a reasonable doubt and (2) respondent received ineffective assistance of counsel because Novak (a) failed to file a motion to suppress respondent's July 2006 admission to police and (b) waived respondent's right to confront witnesses against him by agreeing to admit videotapes of the alleged victims' testimony into evidence. After a May 2008 hearing, the trial court denied respondent's motion and later sentenced respondent to 24 months' probation.

This appeal followed.

In November 2009, we allowed the Juvenile Law Center, the Loyola Civitas Law Center, the Children and Family Justice Center, the Youth Law Center, and the National Juvenile Defender Center to file a brief as amici curiae on respondent's behalf.

## II. ANALYSIS

On appeal, respondent contends (1) he received ineffective assistance of counsel when his attorney (a) labored under a per se conflict of interest by representing respondent and his correspondent brother, both of whom were alleged victims of each other; (b) labored under an actual conflict of interest based on his relationship with respondent's parents, (c) failed to challenge hearsay statements at trial, (d) failed to cross-examine three primary witnesses, and (e) failed to file a motion to suppress respondent's statement to police; (2) he was deprived of right to counsel as guaranteed by section 1-5(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-5(1) (West 2006)) and the due-process clauses of the United States and Illinois Constitutions when his attorney served as both his guardian ad litem and his defense attorney; and (3) the State failed to prove him guilty beyond a reasonable doubt. We disagree.

A. Ineffective Assistance of Counsel

Respondent contends he received ineffective assistance of counsel when Novak (1) labored under a per se conflict of interest by representing respondent and his correspondent brother, both of whom were alleged victims of each other; (2) labored under an actual conflict of interest based on his rela-

- 24 -

tionship with respondent's parents; (3) failed to challenge hearsay statements at trial; (4) failed to cross-examine three primary witnesses; and (5) failed to file a motion to suppress respondent's statement to police.

### 1. Victim-Based Per Se Conflict of Interest

Respondent contends Novak improperly labored under a per se conflict of interest by representing both respondent and R.M. because both were alleged victims of the other.

Whether an attorney labored under a per se conflict of interest is a question of law, which we review de novo. People v. Morales, 209 Ill. 2d 340, 345, 808 N.E.2d 510, 512-13 (2004). A per se conflict of interest arises "[w]hen a defendant's attorney has a tie to a person or entity that would benefit from an unfavorable verdict for the defendant," such as the victim of the defendant's alleged crime. People v. Hernandez, 231 Ill. 2d 134, 142, 146, 896 N.E.2d 297, 303, 305 (2008). Under such circumstances, reversal is automatic unless the record reflects the accused was aware of the conflict and knowingly waived the right to conflict-free counsel. Hernandez, 231 Ill. 2d at 143, 896 N.E.2d at 303.

A strong showing of an intentional and knowing waiver of a conflict-of-interests issue is required before a reviewing

court can deem the issue waived.  People v. Arrequin, 92 Ill. App. 3d 899, 901, 416 N.E.2d 402, 403 (1981).  A reviewing court will not disregard an intentional and knowing waiver unless "an error affecting substantial rights was committed."  People v. Precup, 73 Ill. 2d 7, 17, 382 N.E.2d 227, 231 (1978).

The State contends respondent expressly waived this issue at the onset of the adjudicatory proceedings when he stated he understood the trial court's admonition that "the conflict[-]of[-]interest idea is that Mr. Novak is not in a position to represent both of you because one of you may be guilty and one of you may not be guilty, and he should be repre-senting only one."  Respondent counters that his waiver applied only to his and R.M.'s roles as corespondents, not covictims. We agree with the State.

The underlying incidents upon which the State based its sexual-abuse charges against respondent and R.M. include allegations that respondent and R.M. engaged in sexual miscon-duct with each other.  However, respondent and R.M. did not allege either abused the other.  Rather, they maintained identi-cal defenses--namely, that D.L., J.L., and W.C. fabricated the allegations against them.  Because neither respondent nor R.M. implicated the other as part of their defenses against the

- 26 -

sexual-abuse allegations, Novak's representation of both did not constitute a conflict. In other words, in representing R.M. and respondent simultaneously, Novak did not possess any tie to a person or entity that would benefit from an unfavorable verdict for respondent because neither respondent nor R.M. alleged his innocence based on the other's guilt. See Hernandez, 231 Ill. 2d at 142, 896 N.E.2d at 303.

2. Remaining Ineffective-Assistance-of-Counsel Claims

Respondent argues he was further denied effective assistance of counsel when defense counsel (1) labored under an actual conflict of interest based on his relationship with respondent's parents, (2) failed to challenge hearsay statements at trial, (3) failed to cross-examine three primary witnesses, and (4) failed to file a motion to suppress respondent's statement to police. We disagree.

To demonstrate ineffective assistance of counsel, a criminal defendant must show (1) counsel's performance "fell below an objective standard of reasonableness" and (2) the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). This standard also applies to an attorney's performance in juvenile delinquency proceedings. See In

- 27 -

re Dante W., 383 Ill. App. 3d 401, 411, 890 N.E.2d 1030, 1038 (2008).

a. Actual Conflict of Interest

Respondent argues Novak labored under an actual conflict of interest based on his relationship with respondent's parents. Specifically, respondent alleges an actual conflict existed between Novak's joint representation of respondent's parents and respondent because (1) Mr. and Mrs. M. were also the parents of R.M., one of respondent's alleged victims, and (2) "counsel indicated that [respondent's] parents were directing counsel's representation in a way which was contrary to [respondent]'s objectives." We disagree.

We find Novak's representation of respondent did not amount to error because Novak did not represent respondent's parents in this proceeding. Prior to respondent's adjudicatory hearing, Novak and the trial court had the following exchange:

"THE COURT: Mr. Novak, you are appearing for *** each of the [m]inors and the parents; correct?"

MR. NOVAK: I think the [m]inors, Judge."

The court then apprised Mr. and Mrs. M. as follows:

"At this point, Mr. Novak is entering an

appearance for your sons only.  So, he repre-

sents them and does not represent you.  He

represents what's in the best interests of

these [m]inors, which may or may not be what

the [m]inors or the parents think is in their

best interest."

Respondent argues that despite the trial court's admonition that Novak did not represent Mr. and Mrs. M., Novak's statement that he was "seeking the truth *** as same as the court and as the same as the prosecutor" implied he represented the Ms because both testified they wanted to know the truth as to whether sexual abuse occurred in their home.  However, this does not suggest Novak rendered assistance to respondent's parents that conflicted with his representation of respondent. As stated above, attorneys in juvenile proceedings have a duty to "'not only protect the juvenile's legal rights but *** must also recognize and recommend a disposition in the juvenile's best interest ***.'  [Citation.]"  In re J.D., 351 Ill. App. 3d 917, 920, 815 N.E.2d 13, 16 (2004).

None of the statements cited by respondent suggest Novak ignored his duty to respondent in favor of seeking the truth on behalf of respondent's parents.  At the onset of the

proceedings, Novak noted, "I want to make it clear; my clients have consistently denied the allegations that are being made by these complaints."  Novak advocated for respondent by objecting to the State's questioning of witnesses; cross-examining the witnesses that appeared in court on the State's behalf; and presenting testimony from Mr. M., Mrs. M., An.M., and Ab.M. on respondent's behalf.  As such, we find Novak acted in respondent's interests and thus respondent did not receive ineffective assistance of counsel.

b. Videotaped Statements of D.L., J.L., and W.C.

Respondent further argues he received ineffective assistance of counsel when Novak failed to challenge the admissibility of D.L.'s, J.L.'s, and W.C.'s videotaped statements. According to respondent, allowing such statements into evidence permitted the admission of hearsay evidence and denied respondent his right to cross-examination.

We find respondent waived this argument.  Prior to his adjudicatory hearing, the following exchange occurred.

"THE COURT: *** [Y]ou are now given the
right to cross-examine or ask questions of
these three witnesses who appear by [video-
tape].  ***  [Y]ou have an absolute right to

- 30 -

confront and cross-examine or ask questions

of all the witnesses. ***

* * *

[Respondent], do you understand ***?

[RESPONDENT]: Yes, sir, Your Honor."

Moreover, this matter amounts to one of trial strategy. "[D]ecisions regarding 'what matters to object to and when to object' are matters of trial strategy," to which a reviewing court affords great deference. People v. Perry, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007), quoting People v. Pecoraro, 175 Ill. 2d 294, 327, 677 N.E.2d 875, 891 (1997). Here, Novak stated that in exchange for his inability to cross-examine the witnesses, the State was "giving up the ability to have live testimony[,] which tends to be more persuasive than [videotape]." Accordingly, we find Novak did not render ineffective assistance of counsel by not objecting to the introduction of D.L.'s, J.L.'s, and W.C.'s videotaped testimony.

c. Respondent's Admission

Finally, respondent asserts he received ineffective assistance of counsel when Novak "failed to file a motion to suppress [respondent's] involuntary statement to police." We disagree.

"We review the trial court's ruling on a motion to suppress under a bifurcated standard."  In re Marvin M., 383 Ill. App. 3d 693, 704, 890 N.E.2d 984, 993 (2008).  A reviewing court affords great deference to the trial court's findings of fact, which will be disturbed on appeal only if they are against the manifest weight of the evidence.  Marvin M., 383 Ill. App. 3d at 704, 890 N.E.2d at 994.  However, we review de novo the trial court's ruling on whether a respondent's statements were voluntarily made.  Marvin M., 383 Ill. App. 3d at 704, 890 N.E.2d at 994.

In determining whether a confession was voluntary, a reviewing court considers the totality of the circumstances.  In re G.O., 191 Ill. 2d 37, 54, 727 N.E.2d 1003, 1012 (2000).  "Factors to consider include the respondent's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises."  G.O., 191 Ill. 2d at 54, 727 N.E.2d at 1012.  No single factor controls.  G.O., 191 Ill. 2d at 54, 727 N.E.2d at 1012.  "The test of voluntariness is whether the respondent 'made the statement freely, voluntarily, and without

- 32 -

compulsion or inducement of any sort, or whether the [respondent's] will was overcome at the time he or she confessed.'" G.O., 191 Ill. 2d at 54, 727 N.E.2d at 1012, quoting People v. Gilliam, 172 Ill. 2d 484, 500, 670 N.E.2d 606, 613 (1996).

The Supreme Court of Illinois has upheld a 13-year-old juvenile's confession as voluntary, even when police denied the juvenile the opportunity to confer with a parent or other concerned adult before or during the interrogation and instead interviewed the juvenile alone in the middle of the night. G.O., 191 Ill. 2d at 56-57, 727 N.E.2d at 1013. Here, respondent's circumstances are less extreme than those in G.O. Respondent was 16, 3 years older than the respondent in G.O., and arrived at the Paxton police station voluntarily. Once there, he signed a form acknowledging his Miranda rights (Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) and submitted to police questioning in the presence of his father. The totality of the circumstances suggest respondent's admission was voluntary.

Respondent contends the Paxton police chief "employ[ed] psychologically coercive tactics" during his interview with respondent "by engaging in 'very aggressive' and 'very loud' questioning and accusing [respondent] of lying when

- 33 -

he repeatedly denied that he had engaged in sexual misconduct." In support of this contention, respondent cites Mr. M.'s testimony. Mr. M. testified respondent never made any statements agreeing that he engaged in sexual misconduct. However, the fact finder could reasonably view Mr. M.'s testimony as suspect. He testified R.M. received similar hostile questioning from the police chief, but Mr. M. did not end R.M.'s questioning prematurely. He offered no explanation as to why he did so in respondent's interview but not in R.M.'s. Thus, the inference arises that Mr. M. may have cut off respondent's interview because respondent made incriminating statements. Foley further called into question Mr. M.'s testimony that respondent made no admission during questioning when she testified the police chief did not suggest respondent's admission but, rather, that respondent himself provided the answer.

We find respondent's admission voluntary, and therefore, if Novak had filed a motion to suppress the admission, it would have most likely been denied by the trial court. Accordingly, we reject respondent's contention he received ineffective assistance of counsel when Novak failed to file a motion to suppress respondent's admission.

B. Right to Counsel

Next, respondent argues he was denied his right to counsel when attorney Novak acted as both guardian ad litem and defense counsel.  Specifically, respondent contends the Act and the due-process clauses of the Illinois and United States Constitutions prohibit attorneys in delinquency proceedings from serving as both defense counsel and guardian ad litem.  According to respondent, such "hybrid representation" creates a per se conflict and, specific to the underlying facts in this case, an actual conflict.  We disagree.

As a threshold matter, we address the State's argument that Novak "did not act as guardian ad litem."  Although the trial court never expressly appointed Novak as guardian ad litem, both the court and Novak himself conceived his role as that of a guardian ad litem--representing the minors' and society's best interests--rather than that of a traditional defense attorney.  Accordingly, we treat the issues raised by respondent as though the trial court formally appointed Novak as guardian ad litem.

1. Per Se Conflict

Respondent argues attorneys may never serve as both guardian ad litem and defense counsel in adjudication-of-

- 35 -

delinquency proceedings because a _per se_ conflict of interest always exists due to the adversarial nature of such proceedings.

Due-process claims present legal questions, which we review _de novo_. People ex rel. Birkett v. Konetski, 233 Ill. 2d 185, 201, 909 N.E.2d 783, 796 (2009). Because statutory construction and the interpretation of court rules also present questions of law, they are also subject to _de novo_ review. Konetski, 233 Ill. 2d at 193, 909 N.E.2d at 791.

The due-process clause of the fourteenth amendment to the United States Constitution requires counsel represent juveniles during proceedings to determine delinquency. In re Gault, 387 U.S. 1, 36-37, 18 L. Ed. 2d 527, 551, 87 S. Ct. 1428, 1448 (1967); see also U.S. Const., amend. XIV, §1. Similarly, section 1-5(1) of the Act provides that "[n]o hearing on any petition or motion filed under [the] Act may be commenced unless the minor who is the subject of the proceeding is represented by counsel." 705 ILCS 405/1-5(1) (West 2006).

However, despite respondent's arguments to the contrary, the responsibility of the court-appointed juvenile counsel varies from that of other court-appointed counsel because juvenile proceedings under the Act are not as

adversarial as traditional, criminal proceedings.  In re B.K., 358 Ill. App. 3d 1166, 1171, 833 N.E.2d 945, 950 (2005).  "[A]n attorney appointed by the court in a juvenile proceeding 'must not only protect the juvenile's legal rights but he must also recognize and recommend a disposition in the juvenile's best interest, even when the juvenile himself does not recognize those interests.'  [Citation.]"  J.D., 351 Ill. App. 3d at 920, 815 N.E.2d at 16.

According to the Act, appointment of separate counsel is unnecessary when the trial court has already appointed a guardian ad litem who is also a licensed attorney in Illinois "unless the court finds that the minor's interests are in conflict with what the guardian ad litem determines to be in the best interest of the minor."  (Emphasis added.)  705 ILCS 405/1-5(1) (West 2006).  In other words, by permitting an attorney to fulfill both roles, the Act recognizes that "[t]he roles of a guardian ad litem and minor's counsel are not inherently in conflict" because "[b]oth have 'essentially the same obligations to the minor and to society.'"  J.D., 351 Ill. App. 3d at 920, 815 N.E.2d at 15, quoting In re R.D., 148 Ill. App. 3d 381, 387, 499 N.E.2d 478, 482 (1986).

In their briefs, respondent and amici provide case law

from other states and scholarly articles in support of their contention that hybrid representation as defense counsel and guardian _ad_ _litem_ constitutes _per_ _se_ conflict. However, we are unpersuaded and adhere to the established, above-cited case law in Illinois, which allows and, in most cases, encourages counsel for juvenile respondents to protect both minors' legal rights and the best interests of the minors and society. As such, although certain situations may arise in which a conflict exists when an attorney serves as defense counsel and guardian _ad_ _litem_, a juvenile's attorney may serve dual roles without creating a _per_ _se_ conflict of interest.

### 2. Actual Conflict

Respondent also contends that an actual conflict arose from Novak's hybrid representation. Specifically, respondent cites to "actions [Novak took] which adversely affected as performance as defense counsel," such as Novak's decision to waive cross-examination of J.L., D.L., and W.C. and allowing the State "to present the bulk of its case via videotape."

An actual conflict of interest exists when "'"some specific defect in [defense] counsel's strategy, tactics, or decision making is attributable to [a] conflict."'" [Citations.]" Hernandez, 231 Ill. 2d at 144, 896 N.E.2d at 304.

- 38 -

"'"[S]peculative allegations and conclusory statements are not sufficient to establish that an actual conflict of interest affected counsel's performance."'  [Citations.]"  <u>Hernandez</u>, 231 Ill. 2d at 144, 896 N.E.2d at 304.

Respondent argues actual conflict existed when Novak waived cross-examination of J.L., D.L., and W.C. and admitted their testimony into evidence via videotape.  However, our review of the record reveals respondent expressly waived these arguments prior to trial.  Specifically, at the onset of the adjudicatory proceedings against respondent, the following exchange occurred:

"THE COURT: [Y]ou have an absolute right to confront and cross-examine or ask questions of all witnesses.  You are giving up the right to ask questions of these three witnesses by [videotape].

* * *

Do you understand ***, [respondent]?

[RESPONDENT]: Yes, sir, Your Honor."

If the accused waives actual conflict at trial, to obtain reversal on appeal, he must demonstrate prejudice at trial, "<u>i.e.</u>, special circumstances engendering an actual

conflict adversely affecting the defendant's right to a fair trial." People v. Sanders, 294 Ill. App. 3d 734, 737, 691 N.E.2d 142, 145 (1998).

Here, we find no prejudice. In its written order, the trial court deemed the videotaped testimony of J.L., D.L., and W.C. lacking in credibility and instead based its adjudication of respondent's delinquency on respondent's admission to Foley and police that he engaged in oral sex with D.L. The court further noted it also looked to "the State's other evidence" in determining respondent's guilt, but this statement likely pertained to Foley's and Sergeant Yates's in-court testimony, not the videotaped interviews that the court deemed "suspect," "lack[ing in] credibility," and insufficient to prove R.M.'s guilt. Moreover, counsel's decision not to cross-examine J.L., D.L., and W.C. served respondent's interests--namely, as counsel noted, "[the State's Attorney] is giving up the ability to have live testimony[,] which tends to be more persuasive than [videotape]." Accordingly, we conclude that no actual conflict existed in the case at bar and, assuming arguendo that conflict was present, respondent was not prejudiced by any such conflict.

C. Sufficiency of the Evidence

Finally, respondent contends the State failed to prove

- 40 -

him delinquent beyond a reasonable doubt.  We disagree.

In reviewing a challenge to the sufficiency of the evidence, we consider the evidence in a light most favorable to the prosecution.  In re Matthew K., 355 Ill. App. 3d 652, 655, 823 N.E.2d 252, 255 (2005).  We determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  Matthew K., 355 Ill. App. 3d at 655, 823 N.E.2d at 255.  "We will not substitute our judgment for the judgment of the trier of fact unless the judgment was inherently implausible or unreasonable."  Matthew K., 355 Ill. App. 3d at 655, 823 N.E.2d at 255.

Pursuant to section 12-15(b) of the Criminal Code of 1961:

> "The accused commits criminal sexual
> abuse if the accused was under 17 years of
> age and commits an act of sexual penetration
> or sexual conduct with a victim who was at
> least 9 years of age but under 17 years of
> age when the act was committed."  720 ILCS
> 5/12-15(b) (West 2006).

In the case at bar, the trial court afforded little to no weight to the videotaped testimony of D.L., J.L., and W.C.

Rather, the court based its adjudication of delinquency as to respondent on respondent's admission at the Paxton police station that he performed oral sex on D.L. and "the State's other evidence."

Testimony at respondent's adjudicatory hearing differed as to whether respondent made the admission to Sergeant Yates, Foley, and the Paxton police chief. Sergeant Yates and Foley agreed respondent admitted he allowed D.L. "to suck his dick," while Mr. M. testified respondent made no such statement. The resolution of factual disputes and the assessment of the credibility of witnesses is a matter for the trier of fact. See In re Jessica M., 399 Ill. App. 3d 730, 738, 928 N.E.2d 511, 519 (2010), citing People v. Titone, 115 Ill. 2d 413, 422, 505 N.E.2d 300, 303 (1986). A reasonable trier of fact could have found Sergeant Yates's and Foley's testimony more credible because (1) they both attested to respondent speaking the exact same words in his admission; (2) Foley referred to notes she took the day of respondent's questioning at the Paxton police department, which stated he told police he allowed D.L. to perform oral sex on him; and (3) Mr. M. was biased because he wanted his son to avoid possible imprisonment. Thus, the trial court did not err in finding respondent guilty of sexual abuse

and adjudicating him delinquent.

                        III. CONCLUSION

       For the above stated reasons, we affirm the decision

of the trial court.

       Affirmed.

       McCULLOUGH, J., concurs.

       APPLETON, J., dissents.

JUSTICE APPLETON, dissenting:

I respectfully dissent from the majority's decision on the basis that the judgment of the trial court cannot be sustained because reasonable doubt as to respondent minor's guilt exists.

The State and the attorney for the minors stipulated that the testimony of the alleged victims could be received by admission of their recorded statements, which were made to DCFS at the CAC. The trial court found those statements to not be credible. The determination of respondent's guilt then had to be decided on the evidence of his interview with the DCFS investigator and the Paxton police.

Both the DCFS investigator and the chief of police testified that Austin made an inculpatory admission during their interview of him. Both Austin and his father denied that any such admission was made. It is obvious from the testimony at trial that Austin's interview was a highly charged event. Since two different recollections of this interview exist, it proves the wisdom, if not the practical necessity, for recording such interviews by sound, if not by video.

Because the evidence as to Austin's alleged admission is a tie, with no particularized finding by the trial court that

it believed one version over the other, I would reverse the adjudication as not being founded on evidence beyond a reasonable doubt.  The trial court's judgment in finding to the contrary is more a result of its stated suspicion in its order that "something" had happened.  More is required to sustain a juvenile adjudication with severe and lasting consequences to the respondent minor.